383 F.3d 1006
 State of CALIFORNIA, ex rel. Bill Lockyer, Attorney General, Petitioner,
Coral Power, LLC; Duke Energy North America, LLC; Duke Energy Trading And Marketing, LLC; Transcanada Energy Ltd.; City of Tacoma, Washington; Portland General Electric Company; Dynegy Power Marketing, Inc.; El Segundo Power LLC, Long Beach Generation LLC; Cabrillo Power I LLC; Cabrillo Power II LLC; Mirant Americas Energy Marketing LP; Mirant California, LLC; Mirant Delta, LLC; Mirant Potrero, LLC; Public Service Company of New Mexico; El Paso Merchant Energy LP; BP Energy Co.; Public Service Company of Colorado; Pinnacle West Capital Corporation; Arizona Public Service Co.; Pacificorp; Pacificorp Power Marketing, Inc.; Strategic Energy LLC, Intervenors,
Morgan Stanley Capital Group, Inc., Respondent-Intervenor,
AES Companies; Reliant Energy Services, Inc.; Enron Power Marketing, Inc.; Enron Energy Services, Inc., Intervenors,
Powerex Corp.; Puget Sound Energy; Avista Energy, Inc.; Sempra Energy Trading Corp., Sempra Energy Solutions; Sempra Energy Resources, Respondents-Intervenors,
California Public Utilities Commission, Petitioner-Intervenor,
Williams Energy Marketing & Trading Company, Intervenor,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Avista Corporation, Intervenor,
Long Beach Generation LLC, Respondent-Intervenor.
 No. 02-73093.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted October 9, 2003.
 Filed September 9, 2004.
 
 Paul Stein, Ken Alex, Tom Greene, Richard Frank, Deputy Attorneys General, San Francisco and Sacramento, CA, for petitioner Bill Lockyer.
 Beth G. Pacella, Dennis Lane, Cynthia A. Marlette, Federal Energy Regulatory Commission, Washington, D.C., for respondent Federal Energy Regulatory Commission.
 Howard E. Shapiro, Gary D. Bachman, Cheryl Feik Ryan, Van Ness Feldman, P.C., and Kenneth W. Irvin, Beth S. Brinkmann, Lois K. Perrin, Morrison & Foerster, LLP, Washington, D.C., for intervenor Wholesale Power Suppliers.
 Gary Cohen, Arocles Aguilar, Harvy Y. Morris, Elizabeth McQuillan, Michael Edson, San Francisco, CA, for amicus curiae California Public Utilities Commission.
 On Petition for Review of an Order of the Federal Energy Regulatory Commission. No. FERC-EL02-71-000.
 Before: THOMAS, McKEOWN, and CLIFTON, Circuit Judges.*
 THOMAS, Circuit Judge:
 
 
 1
 This case presents the question, inter alia, of whether the Federal Energy Regulatory Commission ("FERC") properly authorized and administered market-based energy tariffs. The State of California ("California"), through its Attorney General, claims that it did not, and that California energy consumers are entitled to as much as $2.8 billion in refunds. We conclude that FERC's authorization of market-based tariffs in this case complied with the Federal Power Act, but that FERC abused its administrative discretion by declining to order refunds for violations of its reporting requirements. We therefore grant California's petition in part and remand this case to FERC for refund proceedings.
 
 
 2
 * California's energy crisis in 1995 prompted the California Public Utilities Commission[1] and the California legislature to restructure the electric energy industry. The resulting legislation, Assembly Bill 1890 ("AB 1890"), was designed to dismantle the investor-owned, government-regulated utility model and create a deregulated market in which price would be established by competition. Act of September 23, 1996, 1996 Cal. Legis. Serv. 854, codified in Cal. Pub. Util.Code §§ 330-398.5. Under AB 1890, the major investor-owned, vertically-integrated[2] utilities were required to divest a substantial portion of their power generation plants, to sell the output of their remaining generation capacity to a newly created wholesale clearinghouse known as the California Power Exchange Corporation ("CalPX"). CalPX, which was created by AB 1890, was to provide a centralized auction market for the trading of electricity. It was thus deemed a public utility pursuant to the Federal Power Act, see 16 U.S.C. § 824(e), and thus subject to regulation by FERC, see 16 U.S.C. § 824(b), (d).[3]
 
 
 3
 AB 1890 created another non-profit entity, the Independent System Operator ("ISO"), also subject to FERC jurisdiction, which was to be responsible for managing California's electricity transmission grid and balancing electrical supply and demand. Its operations were to be governed by a tariff and protocols filed with FERC. Under AB 1890, purchases and sales of wholesale power by investor-owned utilities were now subject to FERC jurisdiction. So. Cal. Edison, 307 F.3d at 801.
 
 
 4
 Thereafter, three major investor-owned utilities filed applications with FERC seeking approval of the establishment of CalPX and the ISO, authority to convey operational control of the transmission facilities to the ISO, and authority to sell electrical energy at market based rates. See Pacific Gas and Electric Co., 77 FERC ¶ 61,265 (1996); Pacific Gas and Electric Co., 77 FERC ¶ 61,204 (1996); Pacific Gas and Electric Co., 77 FERC ¶ 61,077 (1996).
 
 
 5
 A condition of FERC's approval of an entity's market-based rate authority was a FERC determination that the entity lacked, or had adequately mitigated market power in the California markets. FERC conducted these inquiries as a means of carrying out its statutory mandate under the Federal Power Act to ensure "just and reasonable" wholesale rates for electricity. 16 U.S.C. § 824d(a). FERC approved the utilities' requests, and granted permission for the utilities to sell electricity at market-based rates in California. FERC also approved the establishment of the ISO and CalPX, which then commenced operations in late March 1998. See generally Pacific Gas and Electric Co., 81 FERC ¶ 61,122 (1997).
 
 
 6
 In June 2000, wholesale electricity prices increased dramatically. In August, San Diego Gas & Electric Company filed a complaint under § 206 of the Federal Power Act ("FPA"), 16 U.S.C. § 824e(a), against all sellers of energy and ancillary services into the CalPX and ISO markets. In response, FERC instituted hearing procedures under FPA § 206 to investigate the justness and reasonableness of the rates of sellers that were subject to FERC jurisdiction into the ISO and CalPX markets.
 
 
 7
 Electricity prices remained at high levels in the winter of 2001, and California's largest utility, Pacific Gas and Electric Company, filed a voluntary petition in bankruptcy under Chapter 11 of the United States Bankruptcy Code. In January of 2001, the Governor of the State of California declared a state of emergency. Pursuant to that order, and in light of rolling blackouts, the Governor directed the State Department of Water Resources ("DWR") to purchase wholesale power on the spot market. By October of 2001, California Energy Resources Scheduler ("CERS"), a division of DWR, had spent approximately $10 billion buying energy on the spot market.
 
 
 8
 In November of 2000, having reviewed San Diego Gas & Electric's complaint, FERC adopted several reform measures. FERC found that the "California market structure provide[d] the opportunity for sellers to exercise market power" in times of tight supply and that such market power could result in "unjust and unreasonable rates." San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange, 93 FERC ¶ 61,121 (2000). In addition to ordering structural and rule changes, FERC ordered an evidentiary hearing to determine the appropriate refund. However, FERC limited the refund to ISO and CalPX spot market transactions during the period from October 2, 2000 through June 20, 2001.
 
 
 9
 A year later, the State of California filed the instant complaint against all sellers of power and ancillary services subject to FERC jurisdiction in markets operated by the ISO and CalPX and sellers of power to CERS (collectively, "California Wholesalers"), alleging that FERC's market-based rate filing requirements violated the FPA and that, even if valid, the reports filed by electricity sellers did not contain the transaction-specific information the FPA requires. California claimed that FERC's improper decision to limit the refund period reduced the refunds owed to California purchasers by as much as $2.8 billion.
 
 
 10
 In order to remedy the alleged violations, California urged FERC to:
 
 
 11
 1) require the California Wholesalers to comply, on a prospective basis, with Section 205 rate-filing requirements;
 
 
 12
 2) to the extent the information [was] not already being provided... require the California Wholesalers to provide transaction-specific information to FERC on all of their short-term sales to the ISO, CalPX and CERS for the calendar years 2000-2001;
 
 
 13
 3) to the extent that any rates for short-term power sold to the ISO, CalPX, or CERS are found to exceed just and reasonable levels, require the California Wholesalers to refund the difference between the rate charged and a just and reasonable rate, plus interest;
 
 
 14
 4) issue a declaration specifying that the rates for short-term power sold to the ISO, CalPX, and CERS are not subject to the filed rate doctrine; and
 
 
 15
 5) institute proceedings to determine whether any other further relief is necessary or appropriate, up to and including the revocation of the California Wholesalers' market based rate authority.
 
 
 16
 The California Wholesalers contended, and FERC ultimately concluded, that California's complaint amounted to an impermissible collateral attack on prior Commission orders pertaining to FERC's market-based rate authority and procedures, on prior FERC determinations regarding refund liability, and as to FERC's decisions to grant the various defendants their respective market-based rate authority. FERC granted the complaint in part, holding that where the California Wholesalers had reported aggregated rather than transaction-specific data, the reports failed to comply with FPA § 205(c). Rather than ordering refunds for the reporting violations, however, FERC held that "the failure to report transactions in the format required by FERC for quarterly reports is essentially a compliance issue" for which "re-filing of quarterly reports to include transaction-specific data is an appropriate and sufficient remedy." 99 FERC ¶ 61,247 at 62,068 (2002).
 
 
 17
 California timely filed a petition for review of FERC's decision and properly invokes our jurisdiction to review final orders of FERC pursuant to 16 U.S.C. § 8251(b).
 
 II
 
 18
 The Federal Power Act governs the transmission and wholesale sales of electrical energy in interstate commerce. 16 U.S.C. § 824(b). Pursuant to its authority under the FPA, FERC has exclusive jurisdiction over interstate wholesale power rates. Id.; Nantahala Power and Light Co. v. Thornburg, 476 U.S. 953, 956, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986). The FPA requires that all rates for the transmission and sale of wholesale electricity be filed with FERC and published for public review. 16 U.S.C. § 824d(c). FERC is obligated to ensure that wholesale power rates are "just and reasonable," 16 U.S.C. § 824d(a), and applied in a non-discriminatory manner, 16 U.S.C. § 824d(b); Entergy Louisiana, Inc. v. Louisiana Public Service Com'n, 539 U.S. 39, 41, 123 S.Ct. 2050, 156 L.Ed.2d 34 (2003). Indeed, FERC's authority to determine whether wholesale rates are "just and reasonable" is exclusive. Mississippi Power & Light Co. v. Mississippi, 487 U.S. 354, 371, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988).
 
 
 19
 Much of the theory that underpins the present controversy has its roots in the "filed rate doctrine," which is central to FERC's operations. "The `filed rate doctrine' was developed in the 19th century as part of a program to regulate the ruthless exercise of monopoly power by the Nation's railroads." Maislin Industries, U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 138, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (Stevens, J., dissenting). During that period, railroad companies often charged substantially higher rates on noncompetitive routes, granted secret discounts to preferred shippers, and overcharged competitors of preferred customers. These concerns, among others, led to the passage of the Interstate Commerce Act ("ICA") in 1887. See Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887) (codified as amended at scattered sections of 49 U.S.C.). The "great purpose" of the ICA, as the Supreme Court has said, was "to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, ... to secure equality of rates as to all, and to destroy favoritism, these last being accomplished by requiring the publication of tariffs, and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination." New York, N.H. & H.R. Co. v. ICC, 200 U.S. 361, 391, 26 S.Ct. 272, 50 L.Ed. 515 (1906). Under the ICA, a carrier could charge a shipper only those rates incorporated in a tariff that the carrier had filed with the ICC. The rate became effective after it was filed unless the rate or the practice employed by the carrier was deemed unreasonable by the ICC. The requirement that carriers collect only the rate they filed, or that the ICC established, became commonly referred to as the "filed rate doctrine." The doctrine, as applied, also meant that private parties could not contract for a price other than the filed rate.
 
 
 20
 The Supreme Court first articulated the filed rate doctrine as applied to the power industry in 1951 in Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co., 341 U.S. 246, 251-52, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The Court held that rates established in power sales contracts filed with and accepted by FERC's predecessor, the Federal Power Commission, were not only binding on the parties, but on the federal courts. Id. In short, under the filed rate doctrine, once rates have been accepted for filing under FPA § 205, utilities must adhere to those rates absent a waiver. Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). The rate filed by the wholesale seller of electricity or fixed by FERC is the only lawful charge and "[d]eviation from it is not permitted upon any pretext." AT & T v. Central Office Telephone, Inc., 524 U.S. 214, 222, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998). Unless the filed rates are challenged administratively, the filed rates become the legal rates. If the rates are challenged, then FERC decides whether the rates are "just and reasonable" and not "unduly discriminatory." Parties may challenge FERC's resolution of these issues in a petition for review before the appropriate United States Court of Appeals. 16 U.S.C. § 8251(b). However, appellate review is deferential. See City of Seattle v. FERC, 923 F.2d 713, 715 (9th Cir.1991).
 
 
 21
 With a fixed rate tariff, the review process is relatively straightforward. A wholesaler would file a rate, which would become the legal rate unless challenged. If FERC determined that the rate was not "just and reasonable" after a challenge, then it would order refunds.
 
 
 22
 However, approximately a decade ago, companies began to file market-based tariffs that did not specify the precise rate to be charged. As a result, FERC then departed from its historical policy of basing rates upon the cost of providing service plus a fair return on invested capital, and began approving market-based tariffs.
 
 
 23
 California contends that the market-based tariff system approved by FERC in this case violates the FPA because it relies on unfiled, privately negotiated rates to satisfy statutory rate filing requirements, and that this cannot be sustained even when the agency has made a prior determination that market forces will drive rights into a zone of reasonableness.
 
 
 24
 In considering FERC's tariff-approving authority, the Supreme Court has emphasized "that the just and reasonable standard does not compel the Commission to use any single pricing formula...." Mobil Oil Exploration & Producing Southeast Inc. v. United Distribution Co., 498 U.S. 211, 224, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991) (discussing the "just and reasonable" requirement in the natural gas context). The Court has recognized that the "just and reasonable" requirement accords FERC "broad rate-making authority." Id.
 
 
 25
 The use of market-based tariffs was first approved in the natural gas context, see Elizabethtown Gas Co. v. FERC, 10 F.3d 866, 870 (D.C.Cir.1993), then as to wholesale sellers of electricity, see Louisiana Energy and Power Authority v. FERC, 141 F.3d 364, 365 (D.C.Cir.1998). However, approval of such tariffs was conditioned on the existence of a competitive market. Id. Thus, market-based applications were approved only if FERC made a finding that "the seller and its affiliates [did] not have, or adequately [had] mitigated, market power." Id.[4] The principle justifying this approach as "just and reasonable" was that "[i]n a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that the price is close to marginal cost, such that the seller makes only a normal return on its investment." Tejas Power Corp. v. FERC, 908 F.2d 998, 1004 (D.C.Cir.1990).
 
 
 26
 In support of its contention that market-based tariffs are impermissible under the FPA, California relies on MCI Telecommunications Corp. v. AT & T, 512 U.S. 218, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) and Maislin Indus. US v. Primary Steel Inc., 497 U.S. 116, 132, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). In MCI, the Supreme Court held that the FCC could not eliminate rate-filing requirements for any class of carrier, even when necessary to promote competitive markets. In Maislin, the Court held that the ICC could not allow common carriers to charge unfiled, privately negotiated rates lower than the filed rates, even when the carriers were in highly competitive markets. Id. at 132-33, 110 S.Ct. 2759. As the Court stated in Maislin, the existence of a competitive market "cannot provide the ICC authority to alter well-established statutory filed rate requirements." Id. at 135, 110 S.Ct. 2759.
 
 
 27
 However, the regulatory scheme before us is different from those under consideration in MCI and Maislin. The agencies in MCI and Maislin relied on market forces alone in approving market-based tariffs. In contrast, FERC's system consists of a finding that the applicant lacks market power (or has taken sufficient steps to mitigate market power), coupled with strict reporting requirements to ensure that the rate is "just and reasonable" and that markets are not subject to manipulation. Here, FERC required the wholesale seller to file a market analysis every four months, and quarterly reports summarizing its transactions during the preceding three months. These transaction summaries include both long and short-term contracts, purportedly with reports of some sales for intervals as small as ten minutes. FERC has affirmed in its presentation before us that it is not contending that approval of a market-based tariff based on market forces alone would comply with the FPA or the filed rate doctrine. Rather, the crucial difference between MCI/ Maislin and the present circumstances is the dual requirement of an ex ante finding of the absence of market power and sufficient post-approval reporting requirements. Given this, FERC argues that its market-based tariff does not run afoul of MCI or Maislin, and we agree.
 
 
 28
 California argues that different reporting requirements should have been established. However, Congress specified that filings be "within such time and within such form" and under "such rules and regulations as the Commission may prescribe," 16 U.S.C. § 824d(c). Thus, so long as FERC has approved a tariff within the scope of its FPA authority, it has broad discretion to establish effective reporting requirements for administration of the tariff.
 
 
 29
 For all of these reasons, California's facial challenge to market-based tariffs fails.[5]
 
 III
 
 30
 Our determination that market-based tariffs do not, per se, violate the FPA does not end our inquiry. California also argues that, even if market-based tariffs are lawful in concept, FERC failed to administer the tariffs in accordance with their terms and abused its discretion in limiting available remedies for regulatory violations. On these issues, we agree with California.
 
 
 31
 As we have discussed, there is nothing inherent in the general concept of a market-based tariff that violates the FPA; however, as MCI and Maislin affirm, a market-based tariff cannot be structured so as to virtually deregulate an industry and remove it from statutorily required oversight. The structure of the tariff complied with the FPA, so long as it was coupled with enforceable post-approval reporting that would enable FERC to determine whether the rates were "just and reasonable" and whether market forces were truly determining the price.
 
 
 32
 For example, in Enron Power Marketing, Inc., 65 FERC ¶ 61,305, FERC emphasized that transaction-specific reporting "is necessary so that the marketer's rates will be on file as required by section 205(c) of the FPA, to evaluate the reasonableness of the charges, and to provide for ongoing monitoring of the marketer's ability to exercise market power." Similarly, FERC has stated that transaction-specific data is the "minimum needed for market monitoring purposes." Revised Public Utility Filing Requirements, 99 FERC ¶ 61,107 (2002).
 
 
 33
 Despite the crucial nature of the transactional reporting, as FERC admits, the reporting requirements were not followed in the period at issue. Indeed, non-compliance with FERC's reporting requirements was rampant throughout California's energy crisis. FERC itself has acknowledged that during the height of the energy crisis the quarterly reports of several major wholesalers failed to include the transaction-specific data through which the agency at least theoretically could have monitored the California energy market:
 
 
 34
 The quarterly reports submitted ... by a number of the respondents do not comply with [the] requirements. For example, Williams Energy Marketing and Trading Company, Dynegy Power Marketing, Inc., Mirant Americas Energy Marketing, LP and Reliant Energy Services, Inc. filed aggregated data in their transaction reports for the fourth quarter 2000 and all four quarters of 2001.... Similarly, any other filings that report aggregate data did not comply with the reporting requirements.
 
 
 35
 State of California ex rel. Bill Lockyer, Attorney General of the State of California v. British Columbia Power Exchange Corp. et al., 99 FERC ¶ 61,247 at 62,066 (2002).
 
 
 36
 Thus, the very mechanism that distinguished FERC's tariff from those prohibited by the Supreme Court in MCI and Maislin was, for all practical purposes, non-existent while energy prices skyrocketed and rolling brown-outs threatened California's businesses and citizens.
 
 
 37
 Despite the promise of truly competitive market-based rates, the California energy market was subjected to artificial manipulation on a massive scale. With FERC abdicating its regulatory responsibility, California consumers were subjected to a variety of market machinations, such as "round trip trades"[6] and "hockey-stick bidding,"[7] coupled with manipulative corporate strategies, such as those nicknamed "FatBoy," "Get Shorty," and "Death Star."[8]
 
 
 38
 However, despite the integral nature of the reporting requirements to an effective market-based tariff, and despite the patent failure of many of the affected companies to provide even minimal reporting, FERC's position here is that violation of tariff reporting requirements is merely a technical "compliance issue," and it is therefore without authority to order refunds retroactively based on reporting failures.
 
 
 39
 FERC misapprehends its legal authority in this context. In fact, FERC possesses broad remedial authority to address anti-competitive behavior. See Transmission Access Policy Study Group v. FERC, 225 F.3d 667, 686 (D.C.Cir.2000). Indeed, in the past, FERC has ordered refunds in instances where utilities violated FPA § 205, either by violating the terms of an accepted rate, or by charging rates without first seeking approval under FPA § 205. In The Washington Water Power Co., 83 FERC ¶ 61,282 (1998), FERC ordered profits disgorged because a regulated utility had violated posting requirements and conferred undue preferences on its marketing affiliate. To do otherwise would allow companies to flout our regulations, and overcharge consumers with impunity." 24 FERC ¶ 61,199 at 61,461, reh'g order, 24 FERC ¶ 61,380, reh'g denied, 25 FERC ¶ 61,308 (1983).
 
 
 40
 Here, because the reporting requirements were an integral part of a market-based tariff that could pass legal muster, FERC cannot dismiss the requirements as mere punctilio. If the ability to monitor the market, or gauge the "just and reasonable" nature of the rates is eliminated, then effective federal regulation is removed altogether. Without the required filings, neither FERC nor any affected party may challenge the rate. Pragmatically, under such circumstances, there is no filed tariff in place at all. The power to order retroactive refunds when a company's non-compliance has been so egregious that it eviscerates the tariff is inherent in FERC's authority to approve a market-based tariff in the first instance. FERC may elect not to exercise its remedial discretion by requiring refunds, but it unquestionably has the power to do so. In fact, if no retroactive refunds were legally available, then the refund mechanism under a market-based tariff would be illusory. Parties aggrieved by the illegal rate would have no FERC remedy, and the filed rate doctrine would preclude a direct action against the offending seller. That result does not comport with the underlying theory or the regulatory structure established by the FPA.
 
 
 41
 One of the animating ideas behind the FPA and the filed rate doctrine was, as we have discussed, the prevention of price discrimination and the imposition of unjust and unreasonable rates by requiring that all customers receive the same published rate. As the Supreme Court noted in Maislin, the purpose of the filed rate doctrine is undermined when it is impossible to review the reasonableness of privately negotiated, unfiled rates. 497 U.S. at 132, 110 S.Ct. 2759. If the tariff is interpreted as FERC urges here, then the tariff runs afoul of Maislin, the filed rate doctrine, and the FPA. If, on the other hand, we view the reporting requirements as integral to the tariff, with implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds for the imposition of unjust, unreasonable and discriminatory rates, then a market-based tariff is permitted. FERC cannot have it both ways. The FPA does not permit it.
 
 
 42
 FERC argues that we owe it deference under Chevron USA Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and that as a result, we cannot reach a contrary conclusion about the limits of its remedial authority. However, Chevron does not require blind deference; the Supreme Court has articulated a more thorough and nuanced approach. See Food & Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 125-26, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). Under Chevron, we must consider first "whether Congress has directly spoken to the precise question at issue." Chevron, 467 U.S. at 842, 104 S.Ct. 2778. "If Congress has done so, the inquiry is at an end; the court `must give effect to the unambiguously expressed intent of Congress.'" Brown & Williamson, 529 U.S. at 132, 120 S.Ct. 1291 (quoting Chevron, 467 U.S. at 843, 104 S.Ct. 2778).
 
 
 43
 As we have often stated, "[w]hen we look to the plain language of a statute in order to interpret its meaning, we do more than view words or subsections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." United States v. Hanousek, 176 F.3d 1116, 1120 (9th Cir.1999) (quoting Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.), 53 F.3d 1064, 1067 (9th Cir.1995)).
 
 
 44
 Thus, as the Supreme Court emphasized in Brown & Williamson, we must analyze the provision in the context of the entire governing statute, see id., presuming congressional intent to create a "symmetrical and coherent regulatory scheme." Id. at 133, 120 S.Ct. 1291 (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)).
 
 
 45
 In addition, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision." Id. If, after conducting such an analysis, we conclude that Congress has not addressed the issue, we "must respect the agency's construction of the statute so long as it is permissible." Id. at 132, 120 S.Ct. 1291 (citing INS v. Aguirre-Aguirre, 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)).
 
 
 46
 In this instance, our statutory construction of FERC's authority is dictated by the plain language and words of the Federal Power Act, and by a common sense application of the principles underlying the FPA. To cabin FERC's section 205 refund authority under the circumstances of this case would be manifestly contrary to the fundamental purpose and structure of the FPA, and cannot be sustained under Maislin and MCI.
 
 
 47
 FERC's construed limitations on its own authority are not supported by a careful examination of the FPA. Either the quarterly report requirement is an integral part of the authorizations under § 205, in which case violations of the requirement cannot be dismissed as mere "compliance issue[s]," or the reporting requirement is a mere compliance issue, in which case, where FERC neglects to require the filing of the reports, and thus does not engage in an active ongoing review, the only arguably serious regulatory screening that exists is FERC's initial determination with respect to a seller's market power — a determination that may bear little or no relation to the realities of subsequent circumstances.
 
 
 48
 It is true that pending a § 205 investigation, FERC may suspend a rate for a period of up to five months, at which point the proposed rate becomes effective subject to a refund if FERC ultimately determines the initially-suspended rate to be unreasonable. However, when the § 205 determination consists of a blanket approval of market-based rates determined solely (at least at the outset) on a lack of market power, the purgatorial period contemplated by the statute does not exist. Either FERC determines an entity has market power and thus is unauthorized to sell at market-based rates, or FERC determines an entity lacks market power and is thus authorized to sell at market-based rates. In the case of the former, there is no market-based rate authority whatsoever subject to the remedies in § 205. In the case of the latter, because the "rates" are already "approved," the only remedies are prospective, and, for that matter, unavailable for a period of 60 days pursuant to § 206(b). In other words, the § 205(e) refund remedy is, practically speaking, eliminated under the scheme as FERC would have us interpret it. Such an interpretation comports neither with the statutory text nor with the Act's "primary purpose" of protecting consumers. So while we agree with FERC that market-based tariffs are not per se invalid under the FPA, it is clearly incorrect to conclude that the reporting requirements are anything less than essential to a valid administration of the market-based system at issue in this case.
 
 
 49
 As we have noted, FERC itself has recognized that it possesses the authority to impose retroactive refunds for § 205 violations in Washington Water Power and Delmarva Power. Here, the reporting requirements were an integral part of a market-based tariff that could pass legal muster. The FPA cannot be construed to immunize those who overcharge and manipulate markets in violation of the FPA. In short, the governing statute can be easily construed in accordance with the principles articulated by the Supreme Court in Brown & Williamson. Therefore, FERC's Chevron argument necessarily fails.
 
 
 50
 For these reasons, we agree with California that FERC improperly concluded that retroactive refunds were not legally available. Although California urges us to order refunds, we decline to do so. It is more appropriate for FERC to reconsider its remedial options in the first instance. We therefore grant the petition and remand to FERC for further proceedings consistent with this opinion.
 
 
 51
 PETITION GRANTED; REMANDED.
 
 
 
 Notes:
 
 
 *
 Following oral argument of this case, Judge Hawkins recused himself. Judge McKeown was drawn as a replacement judge
 
 
 [1]
 The Commission is an agency established by the California Constitution. Cal. Const. art. XII. One of the Commission's duties is the regulation of retail rates for electricity charged by investor owned utilities in California. Cal. Pub. Util.Code § 451. The Commission's restructuring order is contained inRe Proposed Policies Governing Restructuring California's Electric Services Industry and Reforming Legislation, D. 95-12-063 (Dec. 20, 1995), modified by D. 96-01-009 (Jan. 10, 1996).
 
 
 [2]
 In the power industry, there are three major vertical components: generation, transmission, and distribution. Generation involves the production of power through a variety of means. Transmission generally refers to the transmission of high voltage electric power from the points of generation to substations for conversion to delivery voltages. Distribution refers to the delivery of the converted low voltage energy from substations to individual consumers. Under the vertically integrated model, one government-regulated company owned the generation resources, the transmission lines, and the distribution facilities. Under a deregulated model, different entities separately own the generation, transmission, and distribution assets
 
 
 [3]
 This is not our first foray into the thicket of California's attempt to deregulate the power industry. Thus, an exhaustive rendition of the factual background is not required. Further general details are provided in some of our previous decisionsSee, e.g., State of California ex rel. Lockyer v. Dynegy, 375 F.3d 831, 2004 WL 1488195 (9th Cir. July 6, 2004); Southern California Edison Co. v. Lynch, 307 F.3d 794, 801 (9th Cir.2002); In re California Power Exchange Corporation, 245 F.3d 1110, 1114-19; Duke Energy Trading and Marketing, L.L.C. v. Davis, 267 F.3d 1042, 1045-46 (2001).
 
 
 [4]
 FERC defines market power as a seller's ability to "significantly influence price in the market by withholding service and excluding competitors for a significant period of time."Citizens Power & Light Corp., 48 FERC ¶ 61,210 at 61,777 (1989).
 
 
 [5]
 FERC argues that California's facial challenge to market-based tariffs is an impermissible collateral attack on FERC's decision inSan Diego Gas & Elec. Co., 96 FERC ¶ 61,120. We disagree. Both the nature and scope of California's challenge to FERC's system of market-based rates differ significantly from previous narrow challenges to particular aspects of FERC's system. Moreover, while California was a late intervenor in a pertinent proceeding, it was foreclosed from fully litigating the claims at issue in this case. Thus, FERC erred in dismissing California's claims as an impermissible collateral attack on prior Commission orders. As indicated above, however, we agree with FERC that both the Congressionally enacted statutory scheme, and the pertinent case law, indicate that market-based tariffs do not per se violate the FPA.
 
 
 [6]
 Round-trip trades are a mechanism for market manipulation through which an entity attempts to inflate transaction volume through the continuous and frequent sale of a particular commodity. The trades create the appearance of increased revenue and demand, but in actuality produce no net income
 
 
 [7]
 Hockey-stick bidding is a fraudulent practice whereby an extremely high price is demanded for a small portion of a product in light of known inelastic demand (as was the case for energy in California during the energy crisis)
 
 
 [8]
 These monikers are strategies referred to in now notorious internal memos at the Enron Corporation that were released to the public by FERC. "FatBoy" refers to a strategy through which the Houston-based energy company allegedly withheld previously agreed-to deliveries of power so it could sell the energy at a higher price on the spot market. To execute this, the company would over-schedule its load; supply only enough power to cover the inflated schedule; and thus leave extra supply in the market, for which the ISO would pay the company. Via the "Get Shorty" strategy, traders were able to fabricate and sell emergency back-up power (known as ancillary services) to the ISO, receive payment, then cancel the schedules and cover their commitments by purchasing through a cheaper market closer to the time of delivery. Under the "Death Star" strategy, Enron allegedly sought to be paid "for moving energy to relieve congestion without actually moving any energy or relieving any congestion."See `FatBoy,' `Get Shorty,' and `Inc-Ing': A Look at Enron Trading Practices, May 13, 2002, Electric Utility Week 7, 2002 WL 10510230; see also Enron Memos Put FERC in the Hot Seat; All Western Sellers Will be Grilled, May 13, 2002, Electric Utility Week 1, 2002 WL 10510221 (noting, inter alia, that while Enron's monikers may have been unique, its practices in the California energy market were not).