**In re ENRON CORP., et al.,**
**Reorganized Debtors.**

**No. 01 B 16034(AJG).**

United States Bankruptcy Court,
S.D. New York.

June 14, 2005.

Cadwalader, Wickersham & Taft LLP, New York City (Edward A. Smith, Of Counsel), Washington, DC (Mark C. Ellenberg, David F. Williams, Of Counsel), for Reorganized Debtors.

State of California Department of Justice Office of Attorney General, Sacramento, CA (Bill Lockyer, Mark Breckler, Irene K. Tamura, Martin Goyette, Of Counsel), for California Attorney General.

Willoughby & Pascuzzi LLP, Sacramento, CA (Steven H. Felderstein, Paul J. Pascuzzi, Christa K. McKimmy, Of Counsel), for the People of the State of California ex rel. Bill Lockyer, Attorney General.

MEMORANDUM OPINION SUSTAINING DEBTORS' OBJECTION TO PROOFS OF CLAIM NOS. 12172–12174 AND 12252–12257 FILED BY BILL LOCKYER, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA

ARTHUR J. GONZALEZ, Bankruptcy Judge.

The Attorney General of the State of California (the "State") filed separate

proofs of claim in unliquidated amounts on behalf of the People of the State of California (the "People") against Enron Corporation ("Enron Corp.") and certain of its affiliated entities, (collectively, the "Debtors") in the following nine cases: Enron (Claim No. 12173); ENA (Claim No. 12172); EPMI (Claim No. 12174); EESI (Claim No. 12255): Enron Energy Services, LLC (Claim No. 12254); Enron Energy Services Operations, Inc. (Claim No. 12257); Enron Energy Marketing Corp. (Claim No. 12256); and Enron Capital & Trade Resources International Corp. (Claim No. 12253) (collectively, the "Claims"). The Claims are based upon allegation that the Debtors improperly and illegally manipulated energy markets in California, overcharged for energy, and violated state and federal laws and regulations.

The issue before the Court is whether the Claims are preempted by the Federal Power Act (the "FPA") and precluded by the filed rate doctrine. The Court finds that because the Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction over interstate sales of wholesale electricity, the state laws sought to be enforced by the State in the prosecution of the Claims are preempted by the FPA. Further, the filed rate doctrine precludes consideration of such Claims.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Debtors

Commencing on December 2, 2001, and from time to time continuing thereafter, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). On July 15, 2004, the Court entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

### B. The Claims

This litigation arises out of the California energy crisis of 2000–01. Prior to the crisis, the California legislature had passed Assembly Bill 1890[1] to create two non-governmental entities, the California Power Exchange (the "PX") and the California Independent System Operator (the "ISO"), to operate markets and manage the sale of electricity. The PX and the ISO were organized under California law, but regulated by FERC. *California v. Dynegy, Inc.*, 375 F.3d 831, 850 (9th Cir.2004). The central transactions, wholesale sales of energy in interstate commerce, were governed by FERC approved rules and a FERC "jurisdictional" ISO and PX. Further, the centralized wholesale spot electricity markets operated by the ISO and the PX were established subject to FERC review and approval. Since August 2, 2000, FERC has commenced refund, partnership and gaming proceedings to investigate certain of the Debtors. FERC found that they engaged in gaming[2] in the form of inappropriate trading strategies and engaged in the deliberate submission of false information or the deliberate omission of material information. *Enron Power Mktg., Inc.*, et al., 106 FERC ¶ 61,024, 2004 WL 1483824 (2004). Both proceed-

---

1. 1996 Cal. Stat. 854

2. The ISO tariff, through the ISO's Market Monitoring and Information Protocol defines gaming, in part, as "taking unfair advantage of the rules and procedures set forth in the PX or the ISO tariffs, Protocols or Activity Rule ... to the detriment of the efficiency of, and of consumers in, the ISO markets." *Am. Electric Power Service Corp.*, et al., 103 FERC ¶ 61,346, 2003 WL 21480249 (2003).

ings are ongoing, including the determination of remedies by FERC.

On October 11, 2002, the State filed the Claims on behalf of the People, alleging that the Debtors have improperly and illegally manipulated energy markets in California, overcharged for energy, and violated state and federal laws and regulations during the west coast power crisis of 2000 and 2001. The State maintains that the Debtors' alleged conduct in the electricity market constitutes a violation of state antitrust law, specifically, the Cartwright Act,[3] the Unfair Competition Law,[4] and the California Commodity Law.[5] As a result of the Debtors' misconduct, as set forth in the Claims, the State seeks disgorgement, restitution, damages, civil and criminal penalties, and other relief, in an undetermined and unliquidated amount.

On March 4, 2005, the Debtors filed an objection to the Claims filed by the State, seeking to disallow the state claims on the ground that the FPA preempts state law and the filed rate doctrine precludes consideration of these claims.

On April 11, 2005, the State filed its response to the Debtors' objection, requesting the Court hold in abeyance the Debtors' objection to the Claims because FERC has not resolved and concluded many issues raised by the Debtors' objections in its refund, partnership and gaming proceedings. The State contends that it is authorized under state law[6] to act as the representative of the People in bringing such actions. The State argues that it

does not intend to infringe on FERC's jurisdiction. Instead, the State maintains that it seeks the enforcement of state law, a determination of the Debtors' liability under that law, and whatever relief may be afforded under those statutes.

A hearing on this matter was held before the Court on May 18, 2005 (the "Hearing"). At the Hearing, the State argued that the Court would not have to determine a rate. Rather, it contends that the Court can determine liability, and thereafter, can refer the matter to FERC for a determination of remedies.

## II. The Parties' Contentions

The Debtors argue that the state law claims in the electricity market are preempted by the FPA because through the FPA, Congress vested in FERC exclusive jurisdiction over the transmission and sale of wholesale electric energy and *a fortiori*, over whether market participants' conduct violates FERC approved tariffs. Further, the Debtors argue that the filed rate doctrine precludes the state law claims because under the doctrine, once FERC determines that a rate is "just and reasonable," neither the states nor courts can modify that rate. Moreover, the Debtors contend that the state law claims still require the Court to either determine a nonmanipulated rate or to adjudicate whether a tariff was violated.

The State counters that the FPA does not occupy the field completely. In supporting its assertion, the State cites to

---

**3.** The Cartwright Acts prohibits agreements "to limit or reduce the production, or increase the price of merchandise or of any commodity." CAL. BUS & PROF.CODE § 16720(b).

**4.** The Unfair Competition Law prohibits unlawful, unfair, or fraudulent business acts and practices. CAL. BUS. & PROF.CODE § 17200.

**5.** The California Commodity Law prohibits fraudulent acts or conduct in connection with the purchase or sale of a commodity. CAL. CORP.CODE §§ 29536–37.

**6.** Pursuant to CAL. BUS. & PROF.CODE § 17204; CAL. GOVT.CODE § 12658; CAL. BUS. & PROF.CODE §§ 16750(c), 16754, 16760, the State can prosecute violations of these state laws on behalf of the People.

*California v. Federal Power Commission,* 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962), *Otter Tail Power Co. v. United States,* 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and *Grays Harbor v. IDACOR Inc.,* 379 F.3d 641 (9th Cir.2004) to contend that the FPA does not preclude operation of other laws, or judicial adjudication of certain issues relating to wholesale energy markets regulated by FERC. Accordingly, the State maintains that the Court may decide whether the Debtors' various fraudulent gaming and market manipulation activities violate the Unfair Competition Law, the California Commodity Law, and the Cartwright Act.

Additionally, the State challenges the Debtors' assertion that it is impossible for the Court to avoid the determination of a nonmanipulated rate or the adjudication of whether a tariff was violated, if the state law claims are allowed to proceed before the Court. The State maintains that the state law claims here are unrelated to the ISO tariff. Thus, the State argues that the Court would not have to determine a nonmanipulated rate because FERC has done so. The State further seeks to hold the Debtors accountable for violations of state anti-fraud and consumer protection laws resulting from employing fraudulent and deceptive schemes. The State requests the Court to determine liability and then subsequently remand to FERC for a determination of remedies. According to the State, because the filed rates are not at issue before this Court, the filed rate doctrine should not preclude the state law claims. In addition, the State reasons that the filed rate doctrine applies only if rates are properly filed.

## III. DISCUSSION

### A. Legal Standard of Preemption

█ "Federal preemption of state law is rooted in the Supreme Clause, Article VI, clause 2, of the United States Constitution." *Transmission Agency of Cal. v. Sierra Pacific Power Co.,* 295 F.3d 918, 928 (9th Cir.2002). Where Congress manifests an intent to occupy an entire regulatory field, any remedy sought outside of the congressional scheme is considered completely preempted. *Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Federal courts have rarely identified legislation which has been found to completely preempt state jurisdiction. *Caterpillar, Inc. v. Williams,* 482 U.S. 386, 393, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987).

█ Here, neither party raises the argument that complete preemption is applicable, nor is there any evidence in the record that would support the conclusion that Congress intended for complete preemption to apply in this case. In the absence of an express preemption by Congress, state law is preempted (1) "when Congress intends that federal law occupy a given field." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) ("Field Preemption"), and (2) "to the extent that state law actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.* ("Conflict Preemption").

### B. Preemption

#### 1) Field Preemption

█ The Debtors, in support of their position that the state law claims should be barred by FERC's exclusive jurisdiction, cite to *Grays Harbor, Dynegy,* and *Snohomish.* These cases addressed FERC's exclusive jurisdiction and its remedial power concerning the wholesale electricity market. The state law claims in the instant

case, alleging violations of state antitrust and unfair competition law, are nearly identical to those involved in the cited cases, and for the reasons set forth in those cases, field preemption is applicable here.

The *Dynegy* court ruled that "state actions against wholesale electricity suppliers alleging violations of California's unfair business practices law are preempted by FPA because the conduct the state sought to condemn was expressly governed by the ISO tariffs and they encroach upon the substantive provisions of the tariff, an area reserved exclusively to FERC, both to enforce and to seek remedy." 375 F.3d at 852.

The Court finds that the statute's framework under the FPA supports the conclusion in *Dynegy* that FERC has been granted broad authority by Congress, in addition to the authority to determine the "just and reasonable rates" for wholesale power. The statute delegates to the Federal Energy Commission "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce except those which Congress has made explicitly subject to regulation by the states.... Retail sales of electricity and wholesale intrastate sales are within the exclusive jurisdiction of the states." Federal Power Act, 16 U.S.C. § 824–824m.

The State does not dispute that the transactions at issue involved wholesale interstate sales. Further, there has been no evidence presented or any representation by either party that the sales that gave rise to this dispute should be characterized as either retail sales of electricity or wholesale intrastate sales. The statute provides that upon a determination by FERC that "any rate charge, or classification, demanded, observed, charged, or collected by any public utility for any *trans-*

*mission or sale* subject to the jurisdiction of the Commission, or that any rule, regulation, *practice, or contract affecting such rate, charge, or classification* is unjust, unreasonable, unduly discriminatory or preferential, *the Commission shall determine* the just and reasonable rate, charge, classification, rule, regulation, *practice,* or contract to be thereafter observed and in force, and shall fix the same by order." Federal Power Act, 16 U.S.C. § 824e (emphasis added).

Moreover, pursuant to the statute, FERC possesses broad remedial authority to address anti-competitive behavior, specifically through profit disgorgement and refunds. Further, FERC can proceed by rulemaking rather than case-by-case adjudication, and can rely on general findings of systemic monopoly conditions and the resulting potential for anti-competitive behavior, rather than evidence of monopoly and undue discrimination on the part of individual utilities. Federal Power Act, 205, 206(a), as amended, 16 U.S.C.A. §§ 824d, 824e(a); Department of Energy Organization Act, § 403(c), 42 U.S.C.A. § 7173(c).

In addition, after the deregulation of California energy markets, the central transactions, the wholesale sales of energy in interstate commerce, were governed by FERC approved rules and a FERC jurisdictional ISO and PX. Having examined FERC's regulatory authority over the deregulated electricity market in California, the *Snohomish* court concluded that "FERC is doing enough regulation to justify federal preemption of state laws under the market-based system of setting wholesale electricity rates." *Snohomish,* 384 F.3d at 760–61. For instance,

(1) FERC continued to oversee wholesale electricity rates by reviewing and approving a variety of documents filed by the PX and the ISO. FERC approved

the market-based tariffs only upon a showing that the seller lacked or had mitigated its market power. (2) FERC required each seller to file quarterly reports under FPA § 205(c) 16 U.S.C. § 824d(c). (3) FERC reviewed and approved detailed tariffs filed by the PX and the ISO, which described in detail how the markets operated by each entity would function. *Id.*

In addition, "[e]ach participant in the PX and the ISO markets was required to sign an agreement acknowledging that the tariff filed by either the PX or the ISO would govern all transactions in that market." *Id.*

The Court also recognizes that "entities that transact through the ISO or [the] PX and engage in improper practices [7] are in violation of filed tariffs.... FERC and the Market Surveillance Unit are directed by the ISO's Market Monitoring and Information Protocol to refer matters to the FERC for enforcement." 103 FERC ¶ 61,346.

The State does not contest FERC's jurisdiction in the electricity market. Rather, the State argues that field preemption is not applicable because courts have referred the state law claims related to filed tariffs to regulatory commissions. In supporting its assertion, the State cites the Supreme Court's decisions in *Otter Tail Power* and *California v. Federal Power Comm'n.* In both cases, the Supreme Court found that Congress does not intend to bar governments from bringing actions in violation of antitrust laws related to filed tariffs before regulatory commissions.

Having reviewed these cases, the Court disagrees with the State's argument and finds that two important differences exist. First, both cases discussed issues of the interaction between federal administrative law and federal antitrust law; thereby no state law preemption issue was presented in these cases. In *California v. Federal Power Commission,* a gas company filed a motion to dismiss the antitrust suit pursuant to the Clayton Act, § 7 as amended 15 U.S.C.A. § 18, or in the alternative, to stay it, pending completion of the proceedings for its authority to acquire another company's assets pursuant to the Natural Gas Act (the "NGA"), § 7(c) as amended 15 U.S.C.A. § 717f(c), before the Power Energy Commission. 369 U.S. at 483, 82 S.Ct. 901. In *Otter Tail Power,* the government brought an action against an electric power company to enjoin violations of the Sherman Act, 15 U.S.C.A. § 2. 410 U.S. at 368, 93 S.Ct. 1022. In order to protect market competition in certain cases, Congress did not expressly displace federal antitrust laws. The Court will not address whether, as a result, Congress has left room for enforcement of state antitrust laws.

Second, and more importantly, a critical distinction between the instant matter and the two cited cases is that there is a regulatory scheme against anti-competitive be-

---

7. Since 1998, the ISO and the PX tariffs have contained provisions that identify and prohibit "gaming" and "anomalous market behavior" in the sale of electric power. "Anomalous market behavior" is "(1) behavior that departs significantly from the normal behavior in competitive markets that do not require continuing regulation or (2) as behavior leading to unusual or unexplained market outcomes. Circumstances include a) withholding of generation capacity under circumstances in which it would normally be offered in a competitive market; b) unexplained or unusual redeclarations of availability; c) unusual trades or transactions; d) pricing and bidding patterns that are inconsistent with prevailing supply and demand conditions; and e) unusual activity or circumstances relating to imports from or exports to other markets or exchanges." 103 FERC ¶ 61,346 (2003).

havior that has been entrusted to FERC. As the Court discussed above, the statute under 16 U.S.C.A. §§ 824d, 824e(a) provides FERC with broad remedial authority to address anti-competitive behavior. In fact, FERC has exercised this power to act in the proceedings instituted against the Debtors concerning alleged market manipulation during the energy crisis. FERC has asserted that it "can order disgorgement of monies above the post-October 2, 2000 refunds ordered in the California Refund Proceeding, if it finds violations of the ISO and the PX tariffs and finds that a monetary remedy is appropriate for such violations. It can additionally order additional disgorgement of unjust profits for tariff violations that occurred after October 2, 2000." 103 FERC ¶ 61,346. Further, "implicit in Commission orders granting market-based rates to the marketers is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Companies failing to adhere to such standards were and are subject to revocation of their market-based rate authority." 106 FERC ¶ 61,024.

In contrast, the court in *California v. Federal Power Commission* concluded that the NGA did not contain a provision to immunize the carriers involved in the mergers from the Clayton Act. 369 U.S. at 485, 82 S.Ct. 901. "The Commission's standard, set forth in § 7 of the NGA, will serve 'the public convenience and necessity.' If existing natural gas companies violate the antitrust laws, the Commission is directed by § 20(a) to 'transmit such evidence' to the Attorney General." *Id.* at 486, 82 S.Ct. 901. Similarly, the Court in *Otter Tail* found that the limited authority of the Federal Power Commission to order interconnections was not intended to be a substitute for the Sherman Act. 410 U.S. at 375, 93 S.Ct. 1022. Moreover, the Supreme Court in *Carnation Co. v. Pacific Westbound Conference,* 383 U.S. 213, 383

U.S. 932, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966) declined to grant antitrust immunity to a shipping company because "the provisions of the Shipping Act, 46 U.S.C.A. § 801, can not reasonably be construed as an implied repeal of antitrust regulation of the shipping industry's rate-making activities." *Id.* at 217, 86 S.Ct. 781. The Shipping Act does not give the Federal Maritime Commission (the "FMC") any mandate to regulate rate competition and the statutory scheme was designed to minimize the role of the FMC. *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 422, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

The State further argues that the state law claims related to wholesale energy have been allowed by courts in *Grays Harbor* and *Gulf States Util. Co. v. Alabama Power Co.,* 824 F.2d 1465 (5th Cir.1987). The courts in both cases concluded that the state claims concerning contractual disputes were not within the scope of FERC's jurisdiction. The viability of the State's comparison depends on the substantial similarity of facts between the case before the Court and those two cited cases. The Court finds that the facts here are distinguishable. First, the state law claims in the cited cases were related to contractual issues, which exclusively fall within a state's jurisdiction. The court in *Grays Harbor* granted the utility leave to amend its complaint to seek declaratory relief only as to issues of contract formation. 379 F.3d. at 652–53. Similarly, the court in *Gulf States* held that executed contract performance, such as the failure to negotiate in good faith and fraud, were not preempted by the FPA. 824 F.2d at 1474. Here, no evidence or argument presented before the Court demonstrates that there is an issue involving contractual disputes. Second, contract formation issues would not necessarily intrude upon the

rate-setting jurisdiction of FERC. *Grays Harbor*, 379 F.3d. at 653. Therefore, field preemption bars the State from pursuing its state law claims before the Court.

### 2) Conflict Preemption

■ As to conflict preemption, for the foregoing reasons, the Court disagrees with the State that the FPA only provides FERC with authority to determine the "just and reasonable" rates for wholesale power. Instead, FERC has broad authority concerning anti-competitive activities related to the filed rate. Accordingly, conflict preemption also bars the State from pursuing its state law claims before the Court.

### C. Filed Rate Doctrine

■ Another threshold question before the Court is whether the Court would have to determine a tariff. The filed rate doctrine is essentially a rule of jurisdiction whose applicability is circumscribed by both the congressionally mandated jurisdiction of the regulatory agency and the occurrence of the triggering event of filing a rate or tariff. The filed rate doctrine is applicable where rates were filed with a federal regulatory agency and where the offending transactions are carried out with reference to a filed tariff. *E. & J. Gallo Winery v. Encana Energy Servs., Inc.,* Case No. CV F 03–5412 AWILJO. at 15. The Court recognizes that the filed rate doctrine "forbids a regulated entity from charging rates for its service other than those properly filed with the appropriate federal regulatory authority." *Ark. L.A. Gas Co. v. Hall,* 453 U.S. 571, 577–78, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981). The Court also acknowledges that the purpose of the doctrine is "preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure

that regulated companies charge only those rates of which the agency has been made cognizant." *City of Cleveland v. FPC,* 525 F.2d 845, 854 (D.C.Cir.1976).

■ The first argument made by the State is that the filed rate doctrine is inapplicable because no properly filed rates were on file during the period when the alleged conducts occurred. However, the State relied on the following finding in *California v. FERC,* 383 F.3d 1006, 1016 (9th Cir.2004) to support its position "without the required filings, neither FERC nor any affected party may challenge the rate. Pragmatically, under such circumstances, there is no filed tariff in place at all." *Id.* This argument, however, inappropriately equates the Debtors' alleged violation of the filing requirements with no-filed tariffs. FERC required each seller to file quarterly reports pursuant to FPA § 205(c) 16 U.S.C. § 824d(c) on transaction-specific information about its sales and purchases at market-based rates. The court in *Grays Harbor* concluded "while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, they do not fall outside the purview of the doctrine." 379 F.3d at 651.

Further, the Court agrees with the opinion of the *California v. FERC* court which concluded that "the reporting requirements are an integral part of a tariff, with FERC's implied enforcement mechanisms sufficient to provide substitute remedies for the obtaining of refunds for the imposition of unjust, unreasonable and discriminatory rates." 383 F.3d at 1016. On August 13, 2002, FERC's Initial Report in Docket No. PA02–2–000 concluded that the Debtors engaged in the deliberate submission of false information or the deliberate omission of material information.[8] Then,

---

8. FERC found that the Debtors failed to in-

form FERC in a timely manner of changes in

FERC concluded that such behavior constituted market manipulation and resulted in unjust and unreasonable rates and violated the express requirements in the orders allowing the Debtors to make sales at market-based rates. 106 FERC ¶ 61,024, 2004 WL 1483824. As noted by FERC,

implicit in Commission orders granting market-based rates is a presumption that a company's behavior will not involve fraud, deception or misrepresentation. Companies failing to adhere to such standards were and are subject to revocation of their market-based rate authority. The Debtors were expressly directed, when they were granted market-based rate authority, to inform the FERC promptly of changes in status (which would include changes in their generation market shares) that reflect a departure from the characteristics that the FERC relied upon in granting market-based rate authority. *Id.*

Moreover, the Court in *California v. FERC,* indirectly recognized the application of the filed rate doctrine when marketers had not properly reported to FERC where such improper reporting affected the reasonableness of the tariff approved by FERC. 383 F.3d at 1016. Without the availability of retroactive refunds, "[p]arties aggrieved by the illegal rate would have no FERC remedy, and the filed rate doctrine would preclude a direct action against the offending seller. That result does not comport with the underlying theory or the regulatory structure established by the FPA." *Id.*

The second argument made by the State is that the filed rate doctrine is not applicable because the issue presented before the Court is distinguishable from those in *Grays Harbor* and *Snohomish.* The plaintiff in *Snohomish* brought an action against a company that engaged in market manipulation during the energy crisis in violation of state antitrust and unfair competition law. The court confirmed that the filed rate doctrine applies because the court could not determine the rates that "would have been achieved in a competitive market." 384 F.3d at 761. Similarly, the court in *Grays Harbor* rejected the request from the plaintiff for a determination of the "fair price." 379 F.3d at 645. Here, the State argues that it is not asserting a price which should be paid in a competitive market as the benchmark for a calculation of a remedy. Rather, the State maintains that the remedy would be unrelated to the ISO tariff and the Court would not have to determine a non-manipulated rate because FERC has done so. The State argues that it is merely requesting the Court to determine liability, and thereafter, remand to FERC for a determination of remedies.

The Ninth Circuit in *California v. FERC* examined the substance of the law and remanded to FERC for the determination of remedies. The court there declined to order refunds to a state because the court reasoned it was more appropriate for FERC to consider its remedial options in the first instance. 383 F.3d at 1018. The substantive law examined by the court in *California v. FERC* concerned whether retroactive refunds were legally available. *Id.* As such, no liability issue was raised and determined by that court. However, the Court finds that determining the liability or the legal right of the State against the Debtors for violation of the antitrust laws would have to be measured by the tariff. Therefore, the filed rate doctrine would be applicable.

their market shares that resulted from their gaining influence/control over others' facilities, as required under their market-based

rate authorization. 106 FERC ¶ 61,024, 2004 WL 1483824.

In addressing the right of action that a violation of the antitrust laws give to one who has been injured in its business or property, the Supreme Court in *Keogh v. Chicago & N.W.R.Y. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), stated that "[i]njury implies violation of a legal right." *Id.* at 163, 43 S.Ct. 47. The Supreme Court concluded that "the legal rights of [a] shipper as against [a] carrier in respect to a rate are measured by the published tariff." *Id.* at 163, 43 S.Ct. 47. Justice Brandeis explained "[a] rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti–Trust Act. What rates are legal is determined by the Act to Regulate Commerce. Under Section 8 of the latter act ... the exaction of any illegal rate makes the carrier liable to the 'person injured thereby for the full amount of damages sustained in consequence of any such violation.'" *Id.* at 162, 43 S.Ct. 47. Thus, the finding of liability in antitrust laws would be integral to the Court's determination of whether the Debtors are liable due to their violations of state antitrust law and unfair competition law. For instance, the Court could not determine the overcharge claim owed by the Debtors for any electricity market manipulation without first deciding the reasonableness of the filed tariff.

The Supreme Court case, *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981), further supports the Court's position that the filed rate doctrine should apply here. "In asserting that the filed rate doctrine had no application, respondents in *Arkansas Louisiana* contended that the state court has done no more than determine the damages they have suffered as a result of the breach of a contract by a gas company." 453 U.S. at 579, 101 S.Ct. 2925. The Supreme Court rejected this argument by reasoning that "the mere fact that respon-dents brought this suit under state law would not rescue it, for when Congress has established an exclusive form of regulation ... there can be no divided authority over interstate commerce.... Under the filed rate doctrine, FERC alone is empowered to make that judgment, and until it has done so, no rate other than the one on file may be charged." *Id.* at 580–84, 101 S.Ct. 2925.

Moreover, to award monetary relief, the Court would have to determine a "fair price." Thus, the filed rate doctrine bars the Court from awarding monetary damages sought by the State. Nonetheless, the Court finds that injunctive relief would also be unavailable to the State. The Court agrees with the Ninth Circuit's decision in *Snohomish*, which declined to grant injunctive relief because such relief is barred by the filed rate doctrine and pre-emption principle. 384 F.3d at 762. "Remedies for breach and non-perform-ance of FERC-approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC." *Dynegy*, 375 F.3d at 836.

The decisions from the Second Circuit in *Sun City Taxpayers' Association v. Citizens Utilities Co.*, 45 F.3d 58 (2d Cir.1995) and *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17 (2d Cir.1994), provide an additional basis for dismissal of the Claims sought by the State. The Second Circuit in *Sun City Taxpayers' Association* affirmed the decision from the district court, which had declined the plaintiff's invitation to find a fraud exception to the filed rate doctrine. In determining whether the filed rate doctrine applied, the court focused on the impact the court's decision would have on agency procedures and rate determination. *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 847 F.Supp. 281, 291 (D.Conn. 1994). The Second Circuit in *Wegoland* recognized that the filed rate doctrine ex-

ists for reasons independent of the type of plaintiff maintaining the action. Those reasons include that (a) legislatively appointed regulatory bodies have institutional competence to address rate-making issues, (b) courts lack the competence to set utility rates, and (c) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime. 27 F.3d at 21.

Therefore, having considered the policy objectives, the Court finds it is inappropriate to frustrate FERC's jurisdiction afforded by Congress. The Court lacks authority to impose a different rate than the one approved by a federal agent. Any other conclusion departing from this principle would undermine the filed rate doctrine. The Court, therefore, rejects the State's challenge to the application of the filed rate doctrine. Accordingly, the filed rate doctrine bars the relief sought by the State.

### V. Conclusion

For the foregoing reasons, the Court concludes that the state electricity market manipulation claims are preempted by the FPA and precluded by the filed rate doctrine. Therefore, the Court sustains the Debtors' objection to the Claims filed by the State.

Counsel for the Debtors is directed to settle an order consistent with this Court's Memorandum Opinion.