[No. C051868. Third Dist. June 11, 2007.]

THE PEOPLE ex rel. EDMUND G. BROWN, Jr., as Attorney General, etc., Plaintiff and Appellant, v.
POWEREX CORPORATION, Defendant and Respondent.

**COUNSEL**

Bill Lockyer, Attorney General, Thomas J. Greene, Chief Assistant Attorney General, Mark Breckler, Danette E. Valdez, Annadel A. Almendras, Myung J. Park and Song Hill, Deputy Attorneys General, for Plaintiff and Appellant.

Gurnee and Daniels, Steven H. Gurnee, John A. Mason; Bracewell & Giuliani, J. Clifford Gunter III and Andrew M. Edison for Defendant and Respondent.

**OPINION**

**MORRISON, J.**—After the collapse of Enron Corporation, the Attorney General concluded wholesale energy companies, including Powerex Corporation, had engaged in schemes damaging California energy consumers. He sued Powerex, alleging violations of the unfair competition law (Bus. & Prof. Code, § 17200 et seq.; UCL) and the California Commodity Law of 1990 (Corp. Code, § 29500 et seq.; CCL) seeking damages, penalties and injunctive relief.

The trial court sustained Powerex's demurrer without leave to amend on the ground the claims were barred by the Federal Power Act (16 U.S.C.A. § 791a et seq.; FPA), which grants the Federal Energy Regulatory Commission (FERC) exclusive jurisdiction over the wholesale energy market.

Several Ninth Circuit decisions arising out of the energy crisis have concluded that claims similar to the Attorney General's are barred by the FPA, specifically by implied preemption (field and conflict preemption), and by the filed rate doctrine. Field preemption exists when a federal scheme is comprehensive, leaving no room for state regulation; conflict preemption exists when state regulation would conflict with federal regulation; the filed rate doctrine bars claims which assume rates different from a federal tariff. (See *Public Utility v. Dynegy Power Marketing* (9th Cir. 2004) 384 F.3d 756 (*Snohomish*); *Public Util., Grays Harbor, WA v. Idacorp* (9th Cir. 2004) 379 F.3d 641 (*Grays Harbor*); *California ex rel. Lockyer v. Dynegy, Inc.* (9th Cir. 2004) 375 F.3d 831 (*Dynegy*).)

We conclude the filed rate doctrine bars all of the Attorney General's monetary and injunctive claims. Further, no injunction is warranted because there is no threat that the misconduct will continue. Because the Attorney General does not explain how his complaint might be amended, we shall affirm.

## STANDARD OF REVIEW

Because this case arises on demurrer, for purposes of this appeal we must accept as true the allegations in the complaint. We accept the well-pleaded facts alleged in the complaint and matters judicially noticeable, but not rhetoric or conclusions of law. We consider de novo whether the complaint states a viable claim for relief. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569]; *Faulkner v. Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659].)

## BACKGROUND

### A. The Complaint

"The California Independent System Operator ('ISO') is a not-for-profit corporation established through California's deregulation legislation. The ISO is responsible for operating the high-voltage transmission grid serving most of California. The area encompassing this transmission grid is known as the ISO control area."

Powerex sells wholesale energy within the ISO control area. It engaged in fraudulent trading (or "gaming") schemes which used false and misleading information.

We quote from a decision summarizing background facts which are also alleged in the complaint:

"Before 1996, FERC reviewed electricity rates that were cost-based. The primary factor in setting the rate was the cost of producing and transmitting the electricity. Power suppliers proposed rates by adding up their costs and accounting for an expected rate of return. FERC reviewed and approved tariffs that contained detailed breakdowns of costs and specified rates of return. . . .

"In 1996, California changed this cost-based system of setting wholesale electricity rates to a market-based system, where the rate was determined in a structured market. The California legislature passed Assembly Bill 1890, Cal. Pub. Util. Code § 330 *et seq.*, in an effort to reduce the price of electricity by replacing cost-based rate regulation with rates that were determined by competitive forces. [Citations.] The legislation created two non-governmental entities to operate markets and otherwise manage the sale of electricity: the California Power Exchange ('PX') and the [ISO]. These entities were subject to FERC's regulation. [Citation.]

"The PX operated a market for the purchase and sale of electricity in the 'day-ahead' and 'day-of' markets. The price in these markets was set by evaluating bids submitted by market participants. A seller could submit a series of bids that consisted of price-quantity pairs representing offers to sell (e.g. 5 units at $50 each, but 10 units if the price is $100 each). Similarly, a buyer could submit a series of bids that consisted of price-quantity pairs representing offers to buy. The PX would then establish aggregate supply and demand curves and set the 'market clearing price' at the intersection of the two curves. Then every exchange would take place at the market clearing price, even though some buyers had been willing to pay more and some sellers had been willing to sell for less.

"The ISO managed the transmission network, managing imbalances between supply and demand and maintaining the reliability of the transmission grid. As part of these responsibilities, it operated a 'real-time' or 'spot' market used to balance supply and demand at precise points in time. For example, if customer demand for a particular hour was not met, then the ISO was required to procure power on the spot market to maintain the stability of the grid. In the markets the PX and ISO managed, rates for wholesale electricity rose dramatically during 2000 and 2001. This caused consumer utilities to pay record high prices to traders and generators." (*Snohomish, supra*, 384 F.3d at pp. 758–759; see also *Dynegy, supra*, 375 F.3d at pp. 835–836; *U.S. v. Reliant Energy Services, Inc.* (N.D.Cal. 2006) 420 F.Supp.2d 1043, 1045–1046.)

In May 2000 the price of wholesale power rose sharply, buyers "incurred massive losses," and the two largest investor-owned utilities, Southern California Edison and Pacific Gas & Electric, defaulted on payments to the PX and ISO; by March 2001 the PX had declared bankruptcy. Meanwhile, Governor Gray Davis had declared an emergency and "authorized the State, through the California Department of Water Resources" to purchase electricity, which it did to the tune of $10 billion. These costs were passed on to California consumers.

Beginning in 1999 Powerex had employed fraudulent schemes to justify " 'congestive relief' payments for taking actions that did not relieve any congestion, to receive payment for excess generation through the submission of false schedules, and to circumvent the ISO's price cap by falsely representing the source of the energy." These schemes came to light in connection with the collapse of Enron and are "widely known as the 'Enron trading strategies' but were in fact employed by several market participants, including" Powerex.

These schemes acquired colorful names, such as Death Star, Get Shorty, Fat Boy and Ricochet. The details of each scheme are not important, but we will describe two for illustration.

In Ricochet, Powerex exploited an ISO rule which allowed payments above the price cap for power generated outside the state in times of shortage. Powerex would export power outside the ISO area, then import it back to California, representing it as out-of-market power and exempt from the price cap even though "no energy ever left or re-entered the State."

In Death Star, Powerex submitted false energy schedules: "In one schedule, energy is imported into the ISO control area through a transmission interface. This energy is scheduled to flow in a direction opposite to congestion and is then exported over another transmission interface. The counterflow created by this schedule is supposed to relieve congestion, and the market participant receives a congestion relief payment. However, in a second schedule, the same energy is then circled back to the ISO control area along transmission lines outside of the ISO system. . . . As [a] result . . . no congestion is relieved because no energy is put onto or taken off of the ISO grid."

The Attorney General alleged these and similar schemes were unlawful and unfair business practices proscribed by the UCL and alleged that they represented unlawful artifices and false statements in violation of the CCL. In particular the Attorney General alleged Powerex violated both laws by:

"(a) willfully and fraudulently offering to sell ancillary services to the ISO without having any physical resources backing up the sale, and collecting payment for ancillary services it did not provide and had no intention of providing;

"(b) willfully and fraudulently misrepresenting 'out-of-market' sales of power to ISO as 'imports,' and collecting payment for 'out-of-market' sales at prices above the price cap, when in fact the power never left or re-entered California;

"(c) willfully and fraudulently overstating the amount of load it expected to serve, and thereby collecting payment for the 'excess' generation at the market clearing price;

"(d) willfully and fraudulently scheduling non-firm energy in the opposite direction of congestion to a point outside the ISO control area without having any intention of delivering the power, collecting payment for purportedly relieving congestion, and then cutting the schedule before putting any energy on the grid;

"(e) willfully and fraudulently scheduling power in the opposite direction of congestion without having any intention of delivering the power, and collecting payment for purportedly relieving congestion, when in fact no congestion was relieved . . . ."

Californians were "subjected to the risks and dangers of power supply interruptions, rolling blackouts and other adverse consequences." The complaint sought an injunction, restitution, disgorgement, civil penalties and damages.

### B. Federal Court

Powerex removed the case to federal court, alleging the complaint raised questions about violations of the FPA, which fell within the exclusive jurisdiction of federal courts. (See 16 U.S.C.A. § 825p.) Powerex also claimed it was an arm of the Canadian government, interposing the Foreign Sovereign Immunities Act of 1976 (28 U.S.C.A. § 1602 et seq.; FSIA). The district court remanded the case. The Ninth Circuit dismissed Powerex's appeal. Powerex petitioned for a writ of certiorari on the FSIA claim. (*Powerex Corp. v. California*, No. 05-584.) The United States Supreme Court recently held in related litigation that a statutory bar on appeals from remand orders applied in FSIA cases. (*Powerex Corp. v. Reliant Energy Services, Inc.* (2007) 551 U.S. ___ [168 L.Ed.2d 112, 127 S.Ct. 2411].) The court then denied Powerex's petition in the federal portion of this case. (*Powerex Corp. v. California*, No. 05-584, cert. den. June 25, 2007.)

### C. The Demurrer in State Court

Powerex demurred, claiming preemption and the filed rate doctrine barred the Attorney General's claims. The parties submitted lengthy supporting and opposing papers.

The trial court sustained the demurrer, finding it could not grant "any remedy that would assume a rate different from that determined by FERC. The filed rate doctrine and federal preemption apply to market based rates at issue here."

The Attorney General timely appealed.

### DISCUSSION

The Attorney General acknowledges FERC's authority over wholesale energy rates but states this action "at best, has only a tenuous, remote, or peripheral effect on rates," and therefore it would not "impinge on FERC's

jurisdiction." He also asserts he "does not allege unreasonable electricity rates or seek a determination of the reasonableness of rates charged by Powerex." We disagree with these characterizations.

The gist of the complaint is that *had Powerex acted fairly* the amount charged for wholesale energy would have been less. The propriety of what was charged falls within FERC's bailiwick. Not only did FERC issue tariffs used by Powerex to charge (or overcharge) the ISO, FERC is adjudicating refunds based on its findings of what would have been just and reasonable, amending the tariffs. To impose further amounts would in effect raise those adjusted tariffs beyond what FERC finds is appropriate.

We will first summarize Ninth Circuit cases applying the filed rate doctrine in the context of the FPA, and then apply the doctrine to the Attorney General's claims in this case.

## I. The Filed Rate Doctrine

### A. *TANC*

In *Transmission Agency, North. Cal. v. Sierra Pacific* (9th Cir. 2002) 295 F.3d 918 (*TANC*), TANC had a deal with the Bonneville Power Administration and others (collectively, BPA) which in part called for TANC to build an "intertie" to move energy between California and Oregon. BPA then made a deal with Sierra Pacific to build another intertie. TANC protested to FERC, claiming the new intertie would reduce the energy carried by its intertie. FERC approved the new intertie, but began hearings on the issue. Before those hearings were over TANC sued BPA and others, alleging breach of contract and related theories. (*Id.* at pp. 923–924.) The court concluded some of TANC's claims were preempted by the FPA and others were barred by the filed rate doctrine, which it viewed as a species of preemption:

■ "[T]he filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question. . . . [T]he Supreme Court has extended the doctrine to the [FPA] and to electricity rates.

"In *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.* [(1951) 341 U.S. 246, 251 [95 L.Ed. 912, 71 S.Ct. 692]], the Supreme Court held that a plaintiff in a case involving electricity rates set by the Federal

Power Commission (the precursor to FERC) could 'claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission, and not even a court can authorize commerce in the commodity on other terms.' The Court has explained that this rule is without exception: 'Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction. . . . This was done in the [FPA] by making [Federal Power Commission] jurisdiction plenary and extending it to all wholesale sales in interstate commerce except those which Congress has made explicitly subject to regulation by the States.' [Citation.]

■ "As further developed, the filed rate doctrine has prohibited not just a state court (or a federal court applying state law) from setting a rate different from that chosen by FERC, but also from assuming a hypothetical rate different from that actually set by FERC. In *Arkansas Louisiana Gas Co.* [*v. Hall* (1981) 453 U.S. 571, 579 [69 L.Ed.2d 856, 101 S.Ct. 2925]], the Court stated:

'It would undermine the congressional scheme of uniform regulation of rate regulation to allow a state court to award as damages a rate never filed with the Commission and thus never found to be reasonable within the meaning of the [Natural Gas] Act. Following that course would permit state courts to grant regulated sellers greater relief than they could obtain from the Commission itself.'

"The Court has also expanded the reach of the filed rate doctrine beyond just rates. In *Nantahala Power* [*& Light v. Thornburg* (1986) 476 U.S. 953 [90 L.Ed.2d 943, 106 S.Ct. 2349]], the Supreme Court held that 'the filed rate doctrine is not limited to rates *per se.*' 476 U.S. at 966. Instead, any allocation of power that directly affects rates is protected by the filed rate doctrine. *Id.* at 966–967. Thus, following *Nantahala Power,* we recognized that an allocation of natural gas . . . is covered by the filed rate doctrine, just as if the allocation had been a decision on rates. . . . [¶] . . . [¶]

"In the present case, the common theme in TANC's claims against the utility company defendants for breach of contract, intentional interference with a contractual relationship, and intentional interference with a prospective economic advantage is the contention that TANC is, or would have been, entitled to 4800 MW of transfer capability . . . .

"For a district or state court to conclude that under state contract law the Northwest Parties breached the Agreements . . . by failing to increase the capacity of the Northwest AC Intertie to 5100 MW, the court would have to hold that under state contract law TANC was entitled to 4800 MW of transfer capacity. Yet, state law can no more assume how FERC would allocate access

to interstate transmission capacity than it can assume how FERC would set rates. . . . Although this resolution may leave TANC's state law claims unredressed, such a circumstance is not an unlikely result of preemption." (*TANC, supra*, 295 F.3d at pp. 929–932, citations omitted.)

*TANC* thus establishes that state law claims which depend on assumptions contrary to rates or allocations approved by FERC are barred by the filed rate doctrine. The fact this may leave claims "unredressed" is no basis to depart from the doctrine.

## B. *Dynegy*

*Dynegy, supra*, 375 F.3d 831, arose from the energy crisis, and the Attorney General was the plaintiff. The gist was that "producers fraudulently sold energy on the spot market from reserve capacity that they had contracted to hold in reserve. . . . According to this theory, the companies' unauthorized sale of ancillary services energy threatened the stability of the grid system and left residents of the state vulnerable to blackouts and other disruptions." (*Id.* at p. 836.) The complaint sought "injunctions, restitution, disgorgement, and civil penalties against multiple companies for double-selling reserve generation capacity in violation of" the UCL. (375 F.3d at pp. 836–837.) After holding the claims barred by preemption the court found they were also barred by the filed rate doctrine:

"Under the filed rate doctrine, the terms of the filed tariff 'are considered to be "the law" and to therefore "conclusively and exclusively enumerate the rights and liabilities" ' of the contracting parties. [Citations.] As a result, 'the filed rate doctrine bars all claims—state and federal—that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed.' [Citations.] Thus, to the extent that California argues that the companies owe 'obligations . . . *beyond those* set out in the filed tariffs . . . [such claim] is also barred by the filed rate doctrine.' [Citation.]

" '*[T]he filed rate doctrine's purpose is to ensure that the filed rates are the exclusive source of the terms and conditions by which the [regulated entity] provides . . . the services covered by the tariff.*' [Citation.] To the extent that California is seeking to enforce the penalty provisions of the tariff, or to have them expanded, [fn. omitted] this conflicts with the filed rate doctrine and the exclusive authority conferred to FERC to enforce its tariff." (*Dynegy, supra*, 375 F.3d at p. 853, italics added.)

In the footnote the court observed:

"While the State concedes that the tariff prohibits double-selling of reserve capacity, it contends that restitution and disgorgement of the companies'

ill-begot gains does not conflict with the filed tariff. But the tariff itself specifies the penalties to which companies are subject for violating their reserve capacity commitments." (*Dynegy, supra*, 375 F.3d at p. 853, fn. 24.)

Thus, *Dynegy* held that the Attorney General may not base UCL claims on *violations* of filed tariffs, inasmuch as FERC oversees such violations: "16 U.S.C. § 824e provides that upon a determination by FERC that 'any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.' " (*Dynegy, supra*, 375 F.3d at p. 850, fn. 18.)

### C. *Grays Harbor*

*Grays Harbor, supra*, 379 F.3d 641, also dealt with claims arising out of the energy crisis. Grays Harbor contracted to buy power *at a price to be set by the market*. It later sued, seeking contract rescission or reformation. "In essence, the complaint alleges that the market rate of $249 per megawatt hour price was agreed to only because Grays Harbor believed that the rate was based on a properly functioning market, when in fact the price resulted from a dysfunctional, manipulated market." (*Id.* at p. 645.) Grays Harbor also alleged unjust enrichment, to the extent it paid over *what it would have paid in a fair market*. After the case was removed the district court dismissed it because "the relief sought would require the court to determine a fair price." (*Id.* at pp. 645–646.)

After finding field and conflict preemption barred the complaint *Grays Harbor* addressed the filed rate doctrine:

"The relief sought by Grays Harbor would require the court to set damages by assuming a hypothetical rate, the 'fair value,' in violation of the filed rate doctrine. [Citing *TANC, supra*, 295 F.3d at p. 933.]

"Grays Harbor describes at length the reasons why the filed rate doctrine should not apply here, but its arguments all center on the market-based nature of the rates at issue in this case. Grays Harbor contends that the $249 per

megawatt hour that was charged was not 'filed' with FERC and approved by FERC before it was charged. In short, according to Grays Harbor, FERC simply did not set any rates. Grays Harbor contends that to apply the filed rate doctrine to market-based rates that have not been filed with FERC would be an unwise and unprecedented expansion of the doctrine.

"But, as described above, the market-based rate regime established by FERC continues FERC's oversight of the rates charged. FERC only permits power sales at market-based rates after scrutinizing whether 'the seller and its affiliates do not have, or have adequately mitigated, market power in generation and transmission and cannot erect other barriers to entry.' [Citation.] According to FERC, these conditions assure that the market-based rates charged comply with the FPA's requirement that rates be just and reasonable. [Citations.] This oversight is ongoing, in this case requiring Idaho Power Company to provide notice of any change in status, to file an updated market analysis every three years, and to file various sales agreements and transaction summaries. [Citation.]

"Further, FERC contends that such procedures effectively constitute review of rates prior to their implementation. [Citation.] FERC has clearly stated its belief that these procedures 'satisfy the filed rate doctrine for market-based rates. . . .' [Citations.] Grays Harbor, on the other hand, provides no persuasive authority that the filed rate doctrine does not apply to market-based rates. [Citation.]

"Therefore, while market-based rates may not have historically been the type of rate envisioned by the filed rate doctrine, we conclude that they do not fall outside of the purview of the doctrine. Therefore, the relief sought by Grays Harbor is barred under the filed rate doctrine." (*Grays Harbor, supra*, 379 F.3d at pp. 651–652.)

The majority went on to conclude that Grays Harbor should have been given leave to amend, stating, "A complaint that merely seeks declaratory relief as to contract formation issues would not necessarily intrude upon the rate-setting jurisdiction of FERC." (*Grays Harbor, supra*, 379 F.3d at p. 652.) Although the court cautioned that an amended complaint "must not require the district court to make a determination as to what the 'fair' rate would have been" (*id.* at pp. 652–653), the court did not explain how this would be possible, inasmuch as the claimed mistake was that Grays Harbor did not know *the market price it paid* "resulted from a dysfunctional, manipulated market." (*Id.* at p. 645.)

Because the claimed mistake hinged on an unfair price, leave to amend should have been denied, as Judge Callahan explained in her separate opinion. (*Grays Harbor, supra,* 379 F.3d at pp. 653–654 (conc. & dis. opn. of Callahan, J.).)

### D. *Snohomish*

In *Snohomish, supra,* 384 F.3d 756, the court discussed preemption and the filed rate doctrine together. Snohomish sued wholesale energy sellers based on "California state antitrust and consumer protection laws. Snohomish charges that the defendants manipulated the market and restricted electricity supplies in order to cause artificially high prices in the market from which Snohomish purchased power." (*Id.* at p. 758.) *Snohomish* upheld market-based rates:

"Under the system at issue here, FERC has waived many of the requirements that applied under the cost-based system. For example . . . the utilities do not provide FERC with detailed schedules of their costs. Instead, the price of wholesale electricity is determined in the markets operated by the PX and the ISO.

"FERC continued to oversee wholesale electricity rates, however, by reviewing and approving a variety of documents filed by the defendants, the PX, and the ISO. First, each seller was to file a market-based umbrella tariff, which 'preauthorizes the seller to engage in market-based sales and puts the public on notice that the seller may do so.' [Citation.] FERC approved these market-based tariffs only upon a showing that the seller lacked or had mitigated its market power. . . . [¶]

"Second, FERC required each seller to file quarterly reports, which contained certain required information including the minimum and maximum rate charged and the total amount of power delivered during the quarter. FERC has found this requirement necessary to ensure that rates will be on file as required by FPA § 205(c), 16 U.S.C. § 824d(c), to allow FERC to evaluate the reasonableness of the charges as required by FPA § 205(a), 16 U.S.C. § 824d(a), and to allow FERC to continually monitor the seller's ability to exercise market power. [Citation.]

"Third, FERC reviewed and approved detailed tariffs filed by the PX and the ISO, which described in detail how the markets operated by each entity would function. Many of the rules governing market operations were originally submitted by the PX and the ISO for information purposes only, but

FERC required that these protocols be filed with and approved by the Commission as part of the PX and ISO tariffs. [Citation.] Each participant in the PX and the ISO markets was required to sign an agreement acknowledging that the tariff filed by either the PX or the ISO would govern all transactions in that market.

"After the energy crisis unfolded, FERC ordered wholesalers to disgorge profits that resulted from the kinds of practices Snohomish has alleged here. FERC found that many of these practices were prohibited by the protocols that were filed as part of the PX and ISO tariffs. [Citation.]

"This court has rejected Snohomish's argument that the preemption-related doctrines at issue do not apply when market-based rates are involved. *Grays Harbor*, 379 F.3d 641. . . . We concluded that the district court was precluded from giving [Grays Harbor] the relief it sought because, to award that relief, the district court would have had to determine a 'fair price.' *Id.* at 648. We held that this would interfere with FERC's exclusive jurisdiction to set wholesale rates and was therefore barred by field preemption, conflict preemption, and the filed rate doctrine. *Id.* at 648, 650, 651, 653.

"Snohomish's claims in this case allege violations of state antitrust and unfair competition law rather than the state contract law claims involved in *Grays Harbor,* but Snohomish's claims also ask the district court to determine the rates that 'would have been achieved in a competitive market.' This is the same determination as the 'fair price' determination that we held was barred by preemption principles in *Grays Harbor.* We therefore hold that Snohomish's claims are barred by the filed rate doctrine, by field preemption, and by conflict preemption.

"Snohomish also requests injunctive relief, but our court has also held that this relief is barred by the filed rate doctrine and preemption principles. [*Dynegy, supra*, 375 F.3d at pp. 836–839.] In *Dynegy,* we held that the State of California's claims for violations of California's [UCL], which included a claim for injunctive relief, were barred. *Id.* at 835, 836–39. We said: 'remedies for breach and non-performance of FERC-approved operating agreements in the interstate wholesale electricity market fall within the exclusive domain of FERC.' *Id.* at 836. Here, FERC approved tariffs that included the market protocols that governed sales in the PX and ISO markets. FERC has found that most, if not all, of the practices alleged in Snohomish's complaint violated these protocols. [Citation.] Snohomish's

claim for injunctive relief is therefore preempted. It 'encroach[es] upon the substantive provisions of the tariff, an area reserved exclusively to FERC, both to enforce and to seek remedy.' *See Dynegy*, 375 F.3d at 836 (citations omitted).

■ *"FERC approved tariffs that governed the California wholesale electricity markets. Therefore, if the prices in those markets were not just and reasonable or if the defendants sold electricity in violation of the filed tariffs, Snohomish's only option is to seek a remedy before FERC."* (*Snohomish, supra*, 384 F.3d at pp. 760–762, italics added.)

*Snohomish* thus reaffirms that FERC tariffs were operative during the crisis, although they were unfairly manipulated.

### E. Refund Cases

Recently the Ninth Circuit issued two decisions which illustrate FERC's prerogatives regarding tariffs.

In *Public Utilities Com'n of State, Cal. v. F.E.R.C.* (9th Cir. 2006) 462 F.3d 1027 (*PUC*), in which the Attorney General and Powerex were parties, the court vacated FERC orders which unduly limited the scope of refund proceedings. The court explained that FERC is making orders to correct the unfair payments generated by the colorfully named schemes. (*Id.* at pp. 1040–1065.)

In *Pacific Gas and Elec. v. F.E.R.C.* (9th Cir. 2006) 464 F.3d 861 (*PG&E*) the court upheld FERC decisions allowing ISO to apply rates found by FERC to be reasonable to billings which had been paid during the crisis. The new rates are referred to as the mitigated market clearing price, or MMCP.

### II. The Attorney General's Claims

### A. Existence of a Filed Rate

The Attorney General argues, "the filed rate doctrine does not apply because there was 'in effect' no properly filed tariff during the energy crisis." Market-based rate tariffs were approved by FERC and are being retroactively modified to preclude payments for gaming the market. (See *PG&E, supra*, 464 F.3d at pp. 864–868; *PUC, supra*, 462 F.3d at pp. 1040–1065; *Snohomish, supra*, 384 F.3d at pp. 760–762; see also *Town of Norwood, Mass. v. New England Power Co.* (1st Cir. 2000) 202 F.3d 408, 419 [upholding market-based tariffs] (*Norwood*).) The Attorney General's argument is based upon snippets of a case that, fairly read, undermines his argument.

In *California ex rel. Lockyer v. F.E.R.C.* (9th Cir. 2004) 383 F.3d 1006 (*Lockyer*), the court held FERC had the authority to order refunds to account for the gaming schemes employed by some energy companies, which we have described above. The holding was "that FERC's authorization of market-based tariffs in this case complied with the [FPA], but that FERC abused its administrative discretion by declining to order refunds for violations of its reporting requirements." (*Id.* at p. 1008.)

The court described FERC's approval of the tariffs:

"A condition of FERC's approval of an entity's market-based rate authority was a FERC determination that the entity lacked, or had adequately mitigated market power in the California markets. FERC conducted these inquiries as a means of carrying out its statutory mandate under the [FPA] to ensure 'just and reasonable' wholesale rates for electricity. 16 U.S.C. § 824d(a). FERC approved the utilities' requests, and granted permission for the utilities to sell electricity at market-based rates in California. FERC also approved the establishment of the ISO and [PX] . . . . [¶]

"In June 2000, wholesale electricity prices increased dramatically. In August, San Diego Gas & Electric Company filed a complaint under [the FPA], against all sellers of energy and ancillary services into the [PX] and ISO markets. In response, FERC instituted hearing procedures . . . to investigate the justness and reasonableness of the rates of sellers that were subject to FERC jurisdiction into the ISO and [PX] markets." (*Lockyer, supra,* 383 F.3d at p. 1009.)

During the hearings FERC found that the market structure had, contrary to its intent, allowed some sellers to exercise market power, resulting in " 'unjust and unreasonable' " rates. (*Lockyer, supra,* 383 F.3d at p. 1010.) "In addition to ordering structural and rule changes, FERC ordered an evidentiary hearing to determine the appropriate refund. However, FERC limited the refund to ISO and [PX] spot market transactions during the period from October 2, 2000 through June 20, 2001." (*Ibid.*) Later, California filed a broader complaint with FERC against all power sellers subject to FERC jurisdiction, "alleging that FERC's market-based rate filing requirements violated the FPA and that, even if valid, the reports filed by electricity sellers did not contain the transaction-specific information the FPA requires. California claimed that FERC's improper decision to limit the refund period reduced the refunds owed to California purchasers by as much as $2.8 billion." (*Ibid.*)

The Ninth Circuit rejected California's attack on market-based tariffs. (*Lockyer, supra*, 383 F.3d at pp. 1011–1013.) However, the court agreed that "FERC failed to administer the tariffs in accordance with their terms and abused its discretion in limiting available remedies for regulatory violations." (*Id.* at p. 1014.) The sellers had reporting requirements to enable FERC to monitor the market and ensure the tariffs were just and reasonable. However, sellers had failed to provide accurate transaction reports, as required by the tariffs. (*Id.* at pp. 1014–1015.)

In a rhetorical passage the court stated:

"Thus, the very mechanism that distinguished FERC's tariff from those prohibited by the Supreme Court . . . was, for all practical purposes, non-existent while energy prices skyrocketed and rolling brown-outs threatened California's businesses and citizens.

"Despite the promise of truly competitive market-based rates, the California energy market was subjected to artificial manipulation on a massive scale. With FERC abdicating its regulatory responsibility, California consumers were subjected to a variety of market machinations . . . ." (*Lockyer, supra*, 383 F.3d at pp. 1014–1015.)

The court then rejected FERC's position that the reporting violations were "technical" and did not authorize refunds:

"FERC misapprehends its legal authority in this context. In fact, FERC possesses broad remedial authority to address anti-competitive behavior. [Citation.] Indeed, in the past, FERC has ordered refunds in instances where utilities violated FPA § 205, either by violating the terms of an accepted rate, or by charging rates without first seeking approval under FPA § 205. . . . [¶]

"Here, because the reporting requirements were an integral part of a market-based tariff that could pass legal muster, FERC cannot dismiss the requirements as mere punctilio. If the ability to monitor the market, or gauge the 'just and reasonable' nature of the rates is eliminated, then effective federal regulation is removed altogether. Without the required filings, neither FERC nor any affected party may challenge the rate. *Pragmatically, under such circumstances, there is no filed tariff in place at all.* The power to order retroactive refunds when a company's non-compliance has been so egregious that it eviscerates the tariff is inherent in FERC's authority to approve a market-based tariff in the first instance. FERC may elect not to exercise its remedial discretion by requiring refunds, but it unquestionably has the power to do so. *In fact, if no retroactive refunds were legally available, then the refund mechanism under a market-based tariff would be illusory. Parties*

*aggrieved by the illegal rate would have no FERC remedy, and the filed rate doctrine would preclude a direct action against the offending seller*. That result does not comport with the underlying theory or the regulatory structure established by the FPA." (*Lockyer, supra*, 383 F.3d at pp. 1015–1016, italics added.)

Thus, the court was not actually holding that no tariffs existed, as the Attorney General claims, the court was holding that if FERC's position about the triviality of the reporting requirements were upheld, the tariffs would be unenforceable, or "[p]ragmatically," there would be no tariffs. The passage read in context does not support the Attorney General's claim that the court held no valid tariffs were in place. Indeed, the passage makes the point that FERC alone has the power to enforce the tariffs by awarding refunds where the market machinations resulted in other than "just and reasonable rates," because of the filed rate doctrine. This refutes the claim that the court held no filed tariffs were in place. (See *In re Enron Corp.* (Bankr. S.D.N.Y. 2005) 327 B.R. 526, 534–535 (*Enron*) [rejecting California Attorney General's claim that doctrine does not apply because no filed rates existed].)

### B. Application of the Filed Rate Doctrine

The Attorney General argues the filed rate doctrine does not apply because "what is at issue . . . is the manner under which Powerex conducted itself in the California energy market during the energy crisis." "[T]he Attorney General's claims neither rely on any filed tariff term, directly affect a filed rate or tariff provision, nor collaterally attack the reasonableness of any filed rate . . . ." We disagree.

■ The complaint sought restitution, disgorgement of profits, civil penalties and damages as a result of Powerex's trading activities, alleging the gaming of the market resulted in unfair payments to Powerex, which harmed California electricity consumers and destabilized the power delivery system. Any monetary relief would be in excess of the tariffs eventually applied by FERC and therefore are barred by the filed rate doctrine. (*Snohomish, supra*, 384 F.3d at pp. 760–762; *Dynegy, supra*, 375 F.3d at p. 853; *Grays Harbor, supra*, 379 F.3d at pp. 651–652; *TANC, supra*, 295 F.3d at pp. 929–932; *Enron, supra*, 327 B.R. at pp. 535–537 [barring California Attorney General's claims under UCL and CCL based on gaming the market].) Further, civil penalties are regulatory and "to impose a civil penalty upon an incident or event, without regard to whether injury was suffered, is to regulate the activity that gave rise to the incident or event." (*People v. Union Pacific Railroad Co.* (2006) 141 Cal.App.4th 1228, 1257–1258 [47 Cal.Rptr.3d 92].) Regulating gaming schemes by imposing penalties would grant relief in excess of the tariffs and conflict with FERC's exclusive regulatory power

over the wholesale energy market. (See *Duke Energy Trading and Marketing, L.L.C. v. Davis* (9th Cir. 2001) 267 F.3d 1042, 1056–1057 [state "commandeering orders directly nullify the security and default mitigation provisions of the FERC–approved [PX] rate schedule, and hence cross the 'bright line' between state and federal jurisdiction established by the FPA"].)

The claim of entitlement to injunctive relief, too, is barred by the filed rate doctrine. (*Snohomish*, *supra*, 384 F.3d at pp. 760–762; *Dynegy, supra*, 375 F.3d at pp. 836–839, 852–853; see *Norwood*, *supra*, 202 F.3d at pp. 419–420.) Further, we rejected an injunctive claim arising from the energy crisis, for lack of any "threat that the misconduct to be enjoined is likely to be repeated in the future." (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 465 [30 Cal.Rptr.3d 210].) The Attorney General's complaint and briefing predicates liability on conduct *during the energy crisis*. Gaming could not be successfully attempted now, when the ISO, FERC and the Attorney General are all watching the power companies like hawks.

Because the complaint fails to state any good claim for relief the trial court properly sustained the demurrer.

### III. Leave to Amend

At the hearing in the trial court the Attorney General sought leave to amend to drop the restitution claim. In a footnote on appeal he suggests leave to amend should have been given to "amend the complaint in a manner that would address the court's concerns." Later he states "the court may grant relief that will not conflict with the filed rate doctrine and FERC's exclusive regulation of rates and remedies provided in a tariff."

A party may propose amendments on appeal where a demurrer has been sustained, in order to show that the trial court abused its discretion in denying leave to amend. (Code Civ. Proc., § 472c, subd. (a).) However, the vague claim that "concerns" could be "address[ed]" by an amendment or there may be a type of relief "that will not conflict with the filed rate doctrine" does not satisfy an appellant's duty to spell out in his brief the specific proposed amendments on appeal. (See *Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636–637 [75 Cal.Rptr. 766, 451 P.2d 406]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 110 [87 Cal.Rptr.2d 754].) The Attorney General has not carried his burden as the appellant to show an abuse of discretion by the trial court in declining to grant leave to amend. (Cf. Code Civ. Proc., § 472c, subd. (a).)

## DISPOSITION

The judgment is affirmed. The Attorney General shall pay Powerex's costs on appeal. (Cal. Rules of Court, rule 8.276.)

Blease, Acting P. J., and Butz, J., concurred.

On July 11, 2007, and August 3, 2007, the opinion was modified to read as printed above.