Filed 2/13/14  Tang v. NBBJ CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| HENRY TANG et al., | B242912 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC462188) |
| v. | |
| NBBJ, LP, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Susan Bryant-Deason, Judge.  Affirmed in part and reversed in part.

Wellman & Warren, Scott W. Wellman, Stuart Miller for Plaintiffs and Appellants.

Tucker Ellis, Bart L. Kessel, Rebecca A. Lefler, Anne Swoboda Cruz for Defendant and Respondent NBBJ, LP.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Brittany H. Bartold, Dana A. Fox, Dawn Flores-Oster for Defendants and Respondents L.A. Arena Company, LLC, and L.A. Arena Funding, LLC.

_____

After a two-year-old child fell to his death from the third floor at Staples Center, his family brought suit against the owner of the arena and the architectural firm that designed it. In succession, the trial court sustained demurrers to some of plaintiffs' claims without leave to amend; granted judgment on the pleadings in favor of the architectural firm; and disposed of the remaining claims by way of summary judgment. The court found that the arena owner owed no duty to plaintiffs. We reverse the summary judgment and the dismissal of plaintiffs' claim of an unlawful business practice, and remand the case for further proceedings.

## FACTS

On November 21, 2010, Henry Tang and Hoai Mi Nguyen attended a basketball game with their children, including two-year-old Lucas Tang. They were seated in a luxury box on the third level of Staples Center. Apart from a rear portion containing bar stools and a couch, the box has two tiered rows of fixed seats. Extending up from the carpeted floor at the front of the box to a height of 15 to 16 inches is a solid wall topped by a shelf. The shelf is 11 inches wide, projects toward the front row of seats in the box, and runs the entire length of the box, even in front of the stairs. Affixed to the shelf is a tempered glass barrier. The glass barrier rises 10 inches in front of the seats, and is 26 inches high in front of the stairway that bisects the box. Beyond the barrier is a 25-foot drop to the arena floor.

It is undisputed that Nguyen picked up Lucas and stood him on the shelf in front of the glass barrier. She wished to photograph the child while he stood on the shelf with his back to the basketball court. Lucas did not climb onto the shelf by himself. Nguyen situated Lucas on the center of the shelf where the glass barrier is 26 inches high and 35 inches wide; she realized that there is a lower glass section nearby. Tang was in the rear portion of the suite, not near Lucas, as Nguyen took photographs while standing near the bottom of the stairway that ascends to the living room area.

After each photograph, Nguyen looked down, checked the image, and then looked up to take another photograph. Nothing prevented Lucas from walking to his left or right along the shelf while Nguyen looked at her camera. Nguyen testified, "I was holding my

2

camera, and I took the last picture of him, and I glanced at the fourth picture. When I glanced back up to take the next one, I noticed he wasn't there."[1] Nguyen screamed, "Lucas fell." The child died from injuries sustained in the fall.

It is undisputed that "no one was holding onto Lucas at the time Nguyen was taking the fourth photograph of Lucas, and Nguyen did not ask any other adult to watch or hold or keep an eye on Lucas while Nguyen was taking the fourth picture." Nguyen agreed that Lucas would not have been standing on the ledge had she not placed him there. Neither Nguyen nor Tang know how Lucas got from the 26-inch-high portion of the glass barrier to the 10-inch-high portion. Nguyen would not have allowed Lucas to crawl by himself on the section of the shelf where the glass is only 10 inches high.

At no time since Staples Center opened in 1999 has any other person fallen from a luxury suite. In a request for admissions, Nguyen admitted that the shelf in front of the seats "was constructed to provide an area for patrons to place food, items and beverages while viewing an event at the Staples Center." The shelf was used for that purpose by people in the Tangs' box on the day of the accident.

Assistant Engineering Bureau Chief Ken Gill from the Los Angeles Department of Building and Safety (LADBS) did the plan check for Staples Center, to determine if the proposed arena complied with all state and local building regulations. Gill did not approve the shelf in front of the glass partition. He testified that the shelf was not submitted for approval before Staples Center was built; rather, the plans show a glass barrier standing up 26 inches from the floor, without a shelf. Gill first learned about the existence of the shelf after this accident: he does not know how the shelf came to be attached to the barrier. He testified that had the construction plan been submitted with an 11-inch-wide shelf, he would not have approved it because "somebody can climb over

---

[1]    The police report stated that while Nguyen was "focusing on her iPhone, she observed what she described as a glimpse of Lucas's foot falling." During her deposition, Nguyen took issue with "focusing" on her phone, but agreed that "while you were looking at your iPhone, you then out of the corner of your eye saw a part of Lucas's body going over the tempered glass."

this beverage bench and your effective guardrail height will be reduced from 26-inch to whatever dimension is shown here, about 10 and [one]-quarter-inch."

Gill is not aware of any specialized permit being issued after the construction plans were approved that would authorize the addition of an 11-inch shelf in front of the boxes. He noted that a 26-inch guardrail is authorized in front of the seating area, *without* a beverage bench or shelf sticking out.

Lee Zeidman, General Manager of Staples Center, admitted in his deposition that sitting or standing on the shelf or beverage bar at the front of the boxes is "dangerous." He acknowledged his awareness that people do stand or sit on the shelf. If management is notified that someone is sitting or standing on the shelf, security personnel will be dispatched to tell that person to get off of the shelf. Despite knowing that people stand and sit on the shelf, Zeidman "never took any action to prevent climbing or sitting on the drink rail" because he "felt it wasn't necessary" since no one had fallen from it. Zeidman agreed that Staples Center markets the luxury suites for use by families including children. There are no warning signs at Staples Center relating to patrons' use of the shelf.

Richard Fortman is a principal inspector at LADBS, where he has worked for 24 years. He was designated as LADBS's "person most knowledgeable." Fortman did not recall inspecting the safety barriers at Staples Center, and does not know which inspector in his department examined the barriers or guardrails (the preferred term). The purpose of the guardrail, Fortman said, is to prevent someone from falling from an upper level to the ground below. He testified that the owner of Staples Center and the arena building contractor have inspection report cards showing which inspector looked at the property; LADBS does not keep copies of these report cards.

Terry Knox has served as a building department official in multiple jurisdictions in California. Offering an expert opinion on behalf of plaintiffs, he declared that the arena owner violated building codes by failing to submit its guardrail design to LADBS, resulting in an unapproved design. Further, defendants did not demonstrate that the completed guardrail was inspected by LADBS, another building code violation. The

4

California Building Code, which has been adopted by the City of Los Angeles, requires 26-inch-high balcony guardrails: Knox declared that this height is measured "from the climbing surface or walking surface" and opined that the shelf can be used as a walking, sitting or climbing surface. Knox concluded that the glass barrier had to measure 26 inches up from the top of the shelf. The 10-inch barrier at Staples Center violates the Uniform Building Code and the California Building Code.

Knox opined that even if the guardrail was code compliant, it constituted a dangerous condition because the shelf invites patrons to sit or stand on it, and they do. The danger is magnified by the precipitous drop in the glass barrier height from 26 inches to 10 inches. There are no warning signs informing patrons not to sit, stand, climb or walk on the shelf.

Plaintiffs submitted a declaration from Gary Buffington, as an expert in workplace safety. Buffington opined that the guardrail violated California occupational safety and health (OSHA) standards requiring a barrier of at least 34 inches on arena balconies. The shelf creates a vertical barrier of only 10 inches. There is no catch device to stop falls or signs warning of the danger. H. Harvey Cohen, plaintiffs' expert in hazard control management, declared that the 10-inch glass barrier would not constrain the fall of a child aged two or over, and it is foreseeable that people will misuse the beverage bench in the absence of any warnings not to stand, sit, kneel or lean over it.

## PROCEDURAL HISTORY

Nguyen, Tang and the Estate of Lucas Tang brought suit in May 2011. The complaint against Anschutz Entertainment Group, Inc. (AEG) as the alleged owner of Staples Center and NBBJ (the architectural firm that designed Staples Center) asserted causes of action for wrongful death, premises liability, negligence, negligent design, emotional distress, unfair business practices, and a survivor's claim. AEG demurred and moved to strike portions of the complaint. The trial court sustained demurrers and dismissed plaintiffs' causes of action for premises liability, negligence, and negligent design, finding that they are "duplicative" of plaintiffs' wrongful death claim.

Plaintiffs' first amended complaint asserted causes of action for wrongful death, public nuisance, emotional distress, false advertising, unfair business practices, and a survivor's claim. AEG demurred and moved to strike portions of the amended complaint. Over plaintiffs' opposition, the court dismissed the cause of action for unfair business practices.

Plaintiffs' second amended complaint (SAC) asserts causes of action for wrongful death, public nuisance, negligent infliction of emotional distress, false advertising, and a survivor's claim. AEG demurred to the SAC and moved to strike portions of it. NBBJ joined in the demurrers. Over plaintiffs' opposition, the trial court dismissed the claims for public nuisance and false advertising. The court also struck plaintiffs' request for injunctive relief. The court accepted the parties' stipulation to dismiss AEG from the action because AEG's subsidiaries L.A. Arena Co., LLC, and L.A. Arena Funding LLC (collectively, LA Arena), own and manage Staples Center.

NBBJ moved for judgment on the pleadings, arguing that plaintiffs' claim of a design defect is time-barred: the four-year statute of limitations for patent defects lapsed in 2003, eight years before plaintiffs filed suit. Plaintiffs opposed NBBJ's motion, contending that the wall-and-glass barrier at the front of the luxury box was a latent defect. The court granted NBBJ's motion and denied plaintiffs leave to amend their pleading. On May 24, 2012, the trial court entered judgment for NBBJ. Plaintiffs appealed from the judgment.

LA Arena moved for summary judgment. It argued that it did not owe a duty of care to warn or repair because Lucas was under parental supervision when he fell and the glass barrier was an open and obvious condition. Plaintiffs opposed summary judgment, contending that LA Arena was negligent per se for failing to comply with city and state building codes, and that LA Arena's failure to warn of or repair a dangerous condition of its property presents a triable issue of fact. The trial court granted LA Arena's motion on June 29, 2012. The court found "that there are no triable issues of material fact as to the existence of a duty."

6

After summary judgment was granted, plaintiffs filed a statement of disqualification of the trial judge, requested a new trial, and sought to vacate all prior orders. The court struck the statement of disqualification and denied plaintiffs' motions. This Court denied plaintiffs' writ petition seeking review of the trial court's rulings. (Aug. 20, 2012, B243164.) The trial court entered judgment for LA Arena on August 15, 2012. This appeal followed.

**DISCUSSION**

## 1. Trial Court Bias

Plaintiffs sought to disqualify the trial judge because her husband Paul Deason has produced films shown in cinemas owned by Regal Entertainment Group, a subsidiary of former defendant AEG; plaintiffs reason that Deason, his companies or his employers "do millions of dollars of business with AEG." The trial court struck plaintiffs' petition because there is no connection between Deason's employment and AEG's ownership of cinemas and, in the judge's view, there is no showing she has a financial interest in "a party," meaning LA Arena or its parent company, AEG. Plaintiffs unsuccessfully pursued a petition for a writ of mandate in this Court, challenging the trial court's order striking their statement of disqualification.

A ruling on a motion to disqualify a judge is reviewable only by a timely petition for writ of mandate. (Code Civ. Proc., § 170.3, subd. (d); *People v. Freeman* (2010) 47 Cal.4th 993, 1000.) On appeal following the judgment, the only issue that may be raised is whether there is actual bias or if the "probability of bias on the part of a judge is so great as to become 'constitutionally intolerable,'" resulting in a violation of due process. (*Freeman*, at p. 1001.) To establish a due process violation, a party must demonstrate "'extreme facts.'" (*Ibid.*; *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 219.)

The controlling federal constitutional law is found in *Caperton v. A. T. Massey Coal Co.* (2009) 556 U.S. 868, in which a state court justice did not recuse himself in an appeal from a $50 million damage award against a coal company whose chairman contributed $3 million to the justice's successful campaign to unseat an incumbent on the

7

state's high court. In that "exceptional" case, the Supreme Court found that "there is a serious risk of actual bias—based on objective and reasonable perceptions—when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." (*Id.* at p. 884.)

The case at bench "does not implicate any of the concerns—pecuniary interest, enmeshment in contempt proceedings, or the amount and timing of campaign contributions—which were the factual bases for the United States Supreme Court's decisions in which it found that due process required judicial disqualification." (*People v. Freeman*, *supra*, 47 Cal.4th at p. 1006.) Plaintiffs' claims of bias are untenable. Their reasoning requires us to believe that the judge ruled in favor of LA Arena (an AEG subsidiary) because Regal Cinemas (another AEG subsidiary) shows films that her husband worked on. As plaintiffs state in their briefs, Deason has worked on "dozens of major motion pictures" made by virtually every movie studio in Los Angeles (Disney, Warner Brothers, Paramount, DreamWorks, etc.). It seems a safe bet that Regal Cinemas will continue to exhibit movies made by the different studios, regardless of Deason's involvement or noninvolvement. The success or failure of Deason's films has nothing to do with Regal, which merely shows studio products. Recusal is not required under due process principles as the facts are not "extreme" as in *Freeman*, nor are they "exceptional" as stated in *Caperton*.[2]

## 2. Claims Dismissed on Demurrer

The trial court dismissed several of plaintiffs' claims after sustaining demurrers without leave to amend. We review de novo the ruling on the demurrers, exercising our independent judgment to determine whether a cause of action has been stated as a matter

---

[2] Plaintiffs may make a peremptory challenge once the case is remanded and seek a trial before a different judge. (Code Civ. Proc., § 170.6, subd. (a)(2); *Jane Doe 8015 v. Superior Court* (2007) 148 Cal.App.4th 489, 494-499; *Stubblefield Construction Co. v. Superior Court.* (2000) 81 Cal.App.4th 762, 764-766.)

8

of law.  (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115.)  "[I]t is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment."  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

### a. *Public Nuisance*

A nuisance is "Anything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ."  (Civ. Code, § 3479.)  A *public* nuisance "affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."  (Civ. Code, § 3480.)  A public nuisance involves offenses against, or substantial and unreasonable interference with, the exercise of rights common to the public.  (*People ex re. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1103, 1105.)

The trial court dismissed plaintiffs' public nuisance claim, finding it "duplicative of, and redundant of, the negligence-based cause of action" and because the claim "fails to contain facts showing a special injury . . . of a character different in kind from that suffered by the general public."  A person may maintain an action for a public nuisance only if "it is specially injurious to himself."  (Civ. Code, § 3493.)

"Where negligence and nuisance causes of action rely on the same facts about lack of due care, the nuisance claim is a negligence claim."  (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1349.)  In construction defect cases, """"[a] nuisance in many, if not in most, instances, especially with respect to buildings or premises, presupposes negligence.' . . .""""  (*Ibid.*)  In the *El Escorial* case, the plaintiffs alleged that a plastering company's failure to make a condominium project watertight caused water intrusion, dry rot and toxic mold, giving rise to causes of action for negligence and nuisance.  (*Id.* at pp. 1344-1348.)  Relying on one of its earlier opinions, *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575, in which a city sued for nuisance based on asbestos contamination in its buildings, Division Six of this district

9

concluded that the nuisance claim for the defective condition of property is merely a "clone" of the negligence claim. (*El Escorial*, at pp. 1348-1349.)

To plead a cause of action for public nuisance, plaintiffs must allege: (1) LA Arena manages and operates Staples Center and created a condition that is harmful to health so as to interfere with the comfortable enjoyment of life or property; (2) the condition affected a substantial number of people at the same time; (3) an ordinary person would be reasonably annoyed or disturbed by the condition; (4) the seriousness of the harm outweighs the social utility of LA Arena's conduct; (5) plaintiffs did not consent to the conduct; (6) plaintiffs suffered harm that was different from the type of harm suffered by the general public; and (7) LA Arena's conduct was a substantial factor in causing plaintiffs' harm. (*Birke v. Oakwood Worldwide* (2009) 169 Cal.App.4th 1540, 1548.)

The SAC contains facts common to all causes of action: specifically, the existence of the shelf that invites patrons to sit, kneel or stand on it; the use of a glass barrier "that rises only about 10 inches above the bench"; the higher 26-inch glass barrier that gives protection in front of the stairway; the lack of a catch fall device between the boxes and the floor of the arena; and the violation of building codes requiring an uninterrupted 26-inch barrier. These factors created an unreasonably dangerous condition leading to Lucas's fall and death. The nuisance cause of action adds that the glass barrier was designed to be as invisible as possible, making it difficult—particularly for young children— to see where the high barrier ends and the low barriers begin and creating an optical illusion that the high barrier crosses the entire length of the box. The dangers posed by the low barriers and the absence of warning about them outweigh any benefit for maintaining them, a danger augmented by LA Arena's appeal to have families use the boxes.

Plaintiffs cannot credibly allege that "an ordinary person would be reasonably annoyed or disturbed by the condition." (*Birke v. Oakwood Worldwide*, *supra*, 169 Cal.App.4th at p. 1548.) Unlike drifting cigarette smoke in an apartment complex, as in the *Birke* case, an ordinary person would not be annoyed or bothered by a shelf at a sports arena. Cases finding a public nuisance involve an unlicensed medical marijuana

10

dispensary (*City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153); an unlawfully closed or obstructed street (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, *Lane v. San Diego Elec. Ry. Co.* (1929) 208 Cal. 29); or use of property as a brothel or as a gaming establishment to attract great numbers of disorderly people (*Farmer v. Behmer* (1909) 9 Cal.App. 773, *Kreling v. Superior Court* (1941) 18 Cal.2d 884).  Other instances include keeping diseased animals, maintaining a pond with malarial mosquitoes, storing explosives in the midst of a city, or disseminating odors, dust and smoke.  (See *Monks v. City of Rancho Palos Verdes* (2008) 167 Cal.App.4th 263, 301-302.)

Unlike the examples cited above, the barrier in this case is not a nuisance.  It is innocuous, not annoying.  Plaintiffs conceded that the shelf incorporated into the barrier "was constructed to provide an area for patrons to place food, items and beverages while viewing an event."  It only becomes a problem when misused as a perch.  In that particular situation, it becomes a dangerous condition of property, because LA Arena is aware that the shelf is used as a perch.  Plaintiffs' claim is for negligence, not nuisance.

b. *Unlawful Business Practice*

Plaintiffs' complaint asserted a cause of action for unfair business practices.  The trial court sustained a demurrer to that claim and gave plaintiffs 20 days' leave to amend because they failed to allege facts with sufficient particularity.  After they filed a first amended complaint alleging that the conditions at Staples Center unlawfully violate "code and regulatory provisions," the trial court sustained demurrers without leave to amend and dismissed the claim because plaintiffs failed to identify "a law, a statute, a regulation, or an ordinance that is being violated by the defendants."  The pleading alleged "on information and belief" that building codes and regulations require a continuous and uninterrupted 26-inch vertical barrier in front of the spectator area, and that the barrier in this case violated the law.

Plaintiffs contend that the trial court erred by "denying the Tang family even a single opportunity to amend to identify" the laws that were violated.  Amending the complaint is an issue that is "open on appeal even though no request to amend such pleading was made" in the trial court.  (Code Civ. Proc., § 472c, subd. (a); *City of*

11

*Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746; *Mercury Ins. Co. v. Pearson* (2008) 169 Cal.App.4th 1064, 1072.)  "[L]eave to amend is properly granted where resolution of the legal issues does not foreclose the possibility that the plaintiff may supply necessary factual allegations.  [Citation.]  If the plaintiff has not had an opportunity to amend in response to the demurrer, leave to amend is liberally allowed as a matter of fairness, unless the complaint shows on its face that it is incapable of amendment."  (*City of Stockton*, at p. 747.)  Plaintiffs must spell out in their brief how an amendment can cure a defect or change the legal effect of the pleading.  (*Long v. Century Indemnity Co.* (2008) 163 Cal.App.4th 1460, 1467-1468; *People ex rel. Brown v. Powerex Corp.* (2007) 153 Cal.App.4th 93, 112.)

In their brief, plaintiffs cite the 1998 version of the California Building Standards Code (CBSC) in effect when the arena was built as proof that the design of Staples Center violates state law.  Compliance with the CBSC is mandatory regardless of whether local agencies adopt it.  (*Leslie v. Superior Court* (1999) 73 Cal.App.4th 1042, 1048, 1052.)  CBSC section 509.2 states that the top of guardrails shall not be less than 42 inches in height, except that on a balcony in front of the first row of fixed seats, the top of the guardrail may be 26 inches in height.  The height of the guardrail is "measured vertically above the leading edge of the tread adjacent walking surface, adjacent walking surface or adjacent seatboards."  (CBSC § 1008.5.7.)  Plaintiffs point to the requirement that the minimum height of 26 inches in a sightline-constrained environment "shall be provided where the floor or footboard elevation is more than 30 inches above the floor or grade below."  (CBSC § 1025.14.2.)

Plaintiffs observe that the balcony is more than 30 inches above the arena floor.  Indeed, there is no dispute that the distance from the balcony to the arena floor is 25 feet or more.  Plaintiffs contend that the shelf or beverage bar is the "walking surface" or "footboard" on the balcony above the arena floor:  they reason that the glass barrier must extend vertically 26 inches above the shelf, pursuant to the CBSC provisions cited above.  (It is unclear what a "seatboard" is.)  It is undisputed that the glass barrier is 10 inches high in front of the seats, not 26 inches.

12

LA Arena acknowledges that the building codes require a 26-inch barrier in front of seats. The issue, of course, is where the 26-inch measurement must start. From the carpeted floor? From the top of the wood shelf? From the seat-bottom? This is not a matter that can be resolved at the pleading stage. LA Arena cannot succeed by repeatedly citing the testimony of Staples Center General Manager Lee Zeidman, who was asked whether the configuration was ever approved by the City of Los Angeles and answered, "I've seen documentation." This vague statement—from someone who is not qualified as an expert on building construction—utterly fails as proof that the design satisfies building codes as a matter of law, particularly because Zeidman contradicts himself on the very next page and said "I don't recall" when asked if the City approved the configuration. Where is the initial permit authorizing the construction of this configuration? Who inspected the construction? Where is the documentation showing final approval by LADBS? At the moment, the only credible information comes from LADBS chief engineer, Ken Gill, who testified that the shelf was not in the proposed plans, and he never would have approved the shelf because it violates the building codes. In this regard, plaintiffs cite Los Angeles Municipal Code sections 91.106.1.1 and 91.106.3.1 to show that LA Arena violated the law by failing to obtain a permit for the shelf. Gill's testimony is unrefuted.

Plaintiffs have sufficiently shown that they can amend their pleading to cure its defects or change its legal effect. (Compare *Khoury v. Maly's of California, Inc.* (1993) 14 Cal.App.4th 612, 619 [demurrer properly sustained after plaintiffs failed in three attempts to identify what statutory scheme underpinned their unfair business practice claim or in what manner the defendants' conduct was unlawful].) Given the liberal approach to allowing pleading amendments, plaintiffs must be given leave to amend to allege violations of relevant state and municipal building codes. The trial court's order dismissing plaintiffs' claim for unlawful business practices is reversed.[3]

---

[3] If plaintiffs ultimately succeed in proving a legal violation, they may make a motion under Code of Civil Procedure section 1021.5, which allows the trial court, in its

13

### 3. Judgment on the Pleadings

The trial court granted judgment on the pleadings in favor of NBBJ, finding that plaintiffs' lawsuit is untimely. It dismissed NBBJ from the action. We review the ruling de novo, rendering an independent judgment as to whether a cause of action has been stated. (*Hopp v. City of Los Angeles* (2010) 183 Cal.App.4th 713, 717.)

A four-year limitations period applies to injury and wrongful death claims against architects or contractors arising from a "patent deficiency" in design or construction that is "apparent by reasonable inspection"; the limitations period is measured from the date of "substantial completion" of construction. (Code Civ. Proc., § 337.1, subds. (a), (b), (e).)[4] The statute provides a point of termination for a defendant associated with the design and construction of real property improvements, to free him from "'the need to provide reserves against an uncertain liability extending indefinitely into the future [that] could seriously impinge upon the conduct of his enterprise.'" (*Preston v. Goldman* (1986) 42 Cal.3d 108, 122; *Tomko Woll Group Architects, Inc. v. Superior Court* (1996) 46 Cal.App.4th 1326, 1333-1334.)

A patent defect "'can be discovered by such an inspection as would be made in the exercise of ordinary care and prudence. [Citations.] This is contrasted with a latent defect, one which is hidden and which would not be discovered by a reasonably careful inspection.'" (*Preston v. Goldman*, *supra*, 42 Cal.3d at p. 123.) Whether a construction defect is readily discoverable by the average consumer, during the course of a reasonable inspection, is a question of fact "unless the defect is obvious in the context of common

---

discretion, to award fees to a successful party if a significant public benefit is conferred by the enforcement of an important right affecting the public interest. (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1343; *Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 70.)

[4] Code of Civil Procedure section 337.15 fixes a 10-year limit on actions for injury to real or personal property arising from latent defects in design or construction, but does not apply to claims for personal injury or death. (*Martinez v. Traubner* (1982) 32 Cal.3d 755, 759; *Valley Circle Estates v. VTN Consolidated, Inc.* (1983) 33 Cal.3d 604, 613; *McCann v. Foster Wheeler LLC* (2010) 48 Cal.4th 68, 89-90.)

14

experience; then a determination of patent defect may be made as a matter of law." (*Creekridge Townhome Owners Assn., Inc. v. C. Scott Whitten, Inc.* (2009) 177 Cal.App.4th 251, 256.)

The reasonableness of the inspection depends on "the nature of the thing to be inspected." (*Renown, Inc. v. Hensel Phelps Construction Co.* (1984) 154 Cal.App.3d 413, 420.) For example, the Supreme Court declared that a pond in a residential backyard, surrounded by a 12-inch-high wall, was patently deficient as a matter of law, after a 22-month-old child fell into the pond and sustained permanent injury, because the defect could be discovered with the exercise of ordinary care and prudence. (*Preston v. Goldman*, *supra*, 42 Cal.3d at pp. 110-111, 123.) Similarly, an unfenced swimming pool into which an 18-month-old child fell was patently deficient as a matter of law: the absence of a fence is "open and obvious and within the common experience of the pool user" and "[i]ts character does not change according to the knowledge or sophistication of its users." (*Mattingly v. Anthony Industries, Inc.* (1980) 109 Cal.App.3d 506, 510-512. Compare *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 645-646 [builder's improper siding installation was a latent defect: plaintiffs could not see defects hidden beneath the siding, such as the lack of a vapor barrier and expansion joints].)

The danger of stepping beyond a guardrail is a matter of common experience: the barrier keeps the user away from the adjacent space. (*The Luckman Partnership, Inc. v. Superior Court* (2010) 184 Cal.App.4th 30, 36.) Thus, a design defect that creates enough space for a person to climb through the guardrails is a patent defect, barring the untimely personal injury lawsuit of a worker who stepped through guardrails and fell five stories to the floor of the Los Angeles Convention Center. (*Id.* at pp. 32-33, 36.)

Plaintiffs allege that the glass barrier at Staples Center is a latent defect because it is designed to be as invisible as possible, making it difficult for spectators to perceive, and creating an optical illusion that impedes the ability of a person to realize that the high part of the glass does not continue along the entire length of the box.

Plaintiffs' allegations fail to establish the existence of a latent defect. Like the guardrails at the Convention Center, the wall-and-glass barrier at Staples Center prevents

15

people from stepping into a void from an elevated position. It is a matter of common experience to the average person that climbing or stepping over the barrier would result in a fall, and injury or death. Though the glass varies from 10 inches to 26 inches in height, this is not a "hidden deficiency, unapparent 'by reasonable inspection.'" (*Baker v. Walker & Walker, Inc.* (1982) 133 Cal.App.3d 746, 763.) Indeed, before the accident occurred, Tang and Nguyen undisputedly "knew two sides of the tempered glass were lower than the tempered glass located in the middle of the beverage bar."[5] The absence of a catch-fall device that plaintiffs maintain is required by law is also reasonably discoverable: as they describe it, the missing safety ledge below the balcony would be at least 36 inches wide. A reasonably observant person would notice the absence of a three-foot-wide ledge.

The question is whether there is a patent defect based on the average person's expectations, not whether the defect would be understood by a child of tender years. (*Mattingly v. Anthony Industries, Inc.*, *supra*, 109 Cal.App.3d at p. 511.) This is not a defect hidden from the average person, even if it was not understood by two-year-old Lucas Tang. Because the defect created by NBBJ's design was visible from a reasonable inspection to patrons who have passed through Staples Center since 1999, a wrongful death action arising from the defect had to be commenced within four years after substantial completion of the arena. The four-year period specified in Code of Civil Procedure section 337.1 elapsed, at the latest, in 2004. Plaintiffs' 2011 lawsuit against NBBJ is untimely.

## 4. Summary Judgment

### (a) Standard of Review

Summary judgment is granted if the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to judgment as a matter of

---

[5]    Though plaintiffs contend that their admissions cannot be used against them in a motion for judgment on the pleadings, it would be an exercise in futility to resurrect a claim only to have it fail on summary judgment, in light of the admissions.

law.  (Code Civ. Proc., § 437c, subd. (c).)  A moving defendant must show the existence of a complete defense, or that one or more elements of the plaintiffs' cause of action cannot be proven; the burden then shifts to the plaintiffs to show a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p).)  On appeal, we independently examine the record and review the trial court's ruling de novo, giving no deference to its reasoning.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694.)  We strictly scrutinize the moving party's papers, construing the facts and resolving all doubts and ambiguities in the evidence in favor of the appellants.  (*Innovative Business Partnerships, Inc. v. Inland Counties Regional Center, Inc.* (2011) 194 Cal.App.4th 623, 628; *Sellery v. Cressey* (1996) 48 Cal.App.4th 538, 543.)

*(b)  Evidentiary Rulings*

LA Arena made 61 objections to the undisputed facts proposed by plaintiffs in their opposition to summary judgment, and made 61 more objections to the declarations submitted by plaintiffs.  In a blanket ruling, the trial court sustained every objection, without discussion, on the grounds stated by LA Arena.  Evidentiary rulings are generally reviewed for an abuse of discretion; however, a summary ruling on numerous objections does not provide a meaningful basis for review.  (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447.  See *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 257 ["order sustaining all but one of defendants' objections was a manifest abuse of discretion"].)

Some of the objections—and the trial court's sustaining of them—lack any semblance of legitimate legal reasoning.[6]  LA Arena objected no less than six times on

---

[6]     For example, plaintiffs' undisputed fact Nos. 21 and 22 describe the configuration of the luxury box—an interior section, stairs leading to two rows of seats with a guardrail/barrier in front of the first row of seats, and the height and width of the shelf and glass.  The court sustained objections to these descriptions though they mirror LA Arena's own description of the box in its undisputed fact Nos. 3 and 4.  The court twice sustained LA Arena's objection that Staples General Manager Zeidman did not say whether patrons stand or sit on the shelf.  This is patently false.  When asked if people

the grounds that "Lucas Tang was *not* sitting, *standing*, or climbing on the guardrail, but was purposefully placed there by his mother."  (Italics added.)  The trial court sustained this repeated objection, even though it directly contradicts LA Arena's own undisputed fact No. 12 in support of its motion for summary judgment that "Lucas *was standing* on the beverage bar with his back to the arena in front of the higher portion of the tempered glass."  (Italics added.)

Had the trial court looked at the merits of LA Arena's objections before sustaining them, it would have noticed that some of the objections were frivolous because they contradicted LA Arena's own undisputed facts.  The trial court did not exercise its discretion by weighing the objections in an impartial manner to subserve the ends of substantial justice, as opposed to ruling in an arbitrary and capricious manner.  Failure to exercise discretion is, in itself, an abuse of discretion.  "In the instant case, we have no confidence that it is the discretion of the trial court (as opposed to defendants' attorneys) that we are reviewing."  (*Carnes v. Superior Court*, *supra*, 126 Cal.App.4th at p. 694.)

*(c)  Duty of Care*

LA Arena argued to the trial court that it "owed no duty to plaintiffs."  "Duty," as LA Arena writes, is "'an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.'"  (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734; *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397.)  The existence of a duty is a question of law for the court.  (*Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814, 819.)  Breach of the duty and proximate cause normally present factual questions.  (*Shively v. Dye Creek Cattle Co.* (1994) 29 Cal.App.4th 1620, 1627-1628.)

"The basic rule of tort liability for property owners is that an owner must use ordinary care in the management of his or her property to prevent injury to another."  (*Myrick v. Mastagni* (2010) 185 Cal.App.4th 1082, 1087; Civ. Code, § 1714, subd. (a).)

---

stand or sit on the drink rail, Zeidman answered, "Yes."  He was unable to say how often it occurs because the conduct is not documented "throughout the entire night."

The landowner must act reasonably, in view of the probability of injury. (*Myrick,* at p. 1087.) A landowner "must take such precautions for the safety of his business invitees as are reasonable under all the circumstances, considering their relation, the burden of the interference with his own affairs and the danger to the invitees to be anticipated, and that special caution is required in behalf of invitees of immature age whose inability to appreciate and propensity to ignore certain dangers he ought to consider." (*Roberts v. Del Monte Properties Co.* (1952) 111 Cal.App.2d 69, 74.)

Two-year-old Lucas Tang was an invitee of immature age, yet the trial court focused solely on Nguyen's act of placing Lucas on the shelf, without considering other factors. "[A] parent's negligence in supervising a child may be a factor in determining causation . . . but is generally not a factor in determining duty." (*Amos v. Alpha Property Management.* (1999) 73 Cal.App.4th 895, 899, fn. 2.) The trial court conflated parental comparative negligence and the landowner's duty to maintain a safe premises. Comparative negligence is a jury question.

Staples Center General Manager Lee Zeidman testified that people stand and sit on the shelf at the front of the luxury boxes. He knows that standing or sitting on the shelf is "dangerous," and dispatches security personnel to tell people to get off of the shelf, when notified that this is occurring. There are no signs in the luxury boxes warning people not to stand or sit on the shelf. Zeidman never took action to prevent people from climbing on the shelf because no one had fallen from it. Zeidman agreed that Staples Center markets the luxury suites for use by families, including children.

Under the circumstances, we find that LA Arena owes a duty of care to its customers. Applying the factors cited in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113, it is reasonably foreseeable that patrons like the Tang family would stand on the shelf: defendants' manager is aware that patrons stand on the shelf. It is foreseeable that someone falling from that height would be injured or killed: defendants' manager conceded that patrons' use of the shelf as a perch is "dangerous." LA Arena did not prevent people from perching on the shelf, creating a close connection between the defendants' conduct and the injury suffered. Once LA Arena became aware of patrons'

19

misuse of the shelf, it could have averted the harm by removing the shelf, or by using a higher glass barrier, or at least by placing warning signs on the shelf instructing patrons not to sit or stand on the shelf, none of which would impose a heavy burden on the landowner. When a landowner invites millions of people from the community onto its property, public policy should encourage the owner to provide a safe environment and impose liability for failure to do so, particularly when the landowner encourages patronage by families with toddlers who are unlikely to perceive a dangerous condition. Liability insurance is available to landowners who operate large arenas.

Here, the glass barrier above the shelf where people are known to stand and sit is only 10 inches high. Beyond the glass is a long fall to the arena floor. As a landowner, LA Arena is not entitled to "one free fatal plunge" before its duty to act in the face of a known danger is triggered. (*Maupin v. Widling* (1987) 192 Cal.App.3d 568, 576 [liability may be imposed if the "type of accident may be reasonably anticipated even if such an accident had not occurred before"]. Compare *Edwards v. California Sports, Inc.* (1988) 206 Cal.App.3d 1284 [this Court found no landowner duty to prevent a drunken spectator from climbing over a 50-inch-high fence in the parking lot of the Sports Arena].)

LA Arena asserted that imposing a duty of care "is particularly unacceptable where, as here, the landowner acted in conformity with the law." "Courts have generally not looked with favor upon the use of statutory compliance as a defense to tort liability." (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 547-548.) "[T]he general rule is that statutory compliance is not a complete defense in a tort action." (*Myrick v. Mastagni*, *supra*, 185 Cal.App.4th at p. 1089.) So, for example, an ordinance that did not require retrofitting of unreinforced masonry buildings until 2018 did not protect a landowner whose 111-year-old masonry building collapsed and killed two people during a 2003 earthquake in Paso Robles "because a statute, ordinance or regulation ordinarily defines a minimum standard of conduct" and "[a] minimum standard of conduct does not preclude a finding that a reasonable person would have taken additional precautions under the circumstances." (*Id.* at p. 1087.)

20

In any event, LA Arena's claim of conformity with the law is not supported by the evidence. The testimony of LADBS Assistant Engineering Bureau Chief Ken Gill established that he performed the plan check for Staples Center, to determine if the proposed arena complied with building regulations. Gill stated that the shelf *was not submitted for approval*. Instead, the plans show a glass barrier rising 26 inches from the floor, without a shelf. Gill testified that he would not have approved the architectural plans had they shown an 11-inch-wide shelf because the shelf reduces the guardrail height from 26 inches to 10 inches, in violation of the building code. LA Arena submitted no documentation to the trial court showing that the shelf was an approved, permitted feature that conformed with state and local building codes.[7]

Finally, LA Arena invites us to resolve the issue of causation as a matter of law because "reasonable minds would not differ." We decline the invitation. The photographs in the record show that the 26-inch-high glass barrier at the foot of the stairs—where Lucas was situated by his mother—nearly reached the child's shoulders. A jury could find that if the glass was 26 inches high along the entire suite, instead of suddenly dropping to 10 inches, Lucas would not have lost his balance and fallen from the balcony when he moved or learned sideways. As noted by one of plaintiffs' experts, toddlers have a higher center of gravity that increases the risk of toppling. Whether the accident was caused by a dangerous condition of LA Arena's property is a question of fact, not an issue that can be determined as a matter of law. Nguyen's conduct may also be a cause, and presents a jury issue.

---

[7]    This may prove to be a factor at trial, because "The failure of a person to exercise due care is presumed if: (1) He violated a statute, ordinance, or regulation of a public entity; (2) The violation proximately caused death or injury to person or property; (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (Evid. Code, § 669, subd. (a).) The violation of construction safety standards may be used to establish a duty of care in all negligence and wrongful death actions. (*Elsner v. Uveges* (2004) 34 Cal.4th 915, 928.)

**DISPOSITION**

The judgment dismissing plaintiffs' claims against defendant NBBJ, Inc., is affirmed. NBBJ may recover its costs on appeal. With respect to plaintiffs' claims against defendants L.A. Arena Company, LLC, and L.A. Arena Funding, LLC, the judgment dismissing plaintiffs' claim for public nuisance is affirmed, and the judgment dismissing plaintiffs' claims of an unlawful business practice and negligence is reversed. The L.A. Arena defendants are ordered to bear costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


CHAVEZ, J.


FERNS, J.*

_____

*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.